IN THE UNITED STATES COURT OF FEDERAL CLAIMS

DERM/BURO, INC.,

Plaintiff,

v.

UNITED STATES,

Defendant.

No. 08-CV-00549 (MBH)

# **FIRST AMENDED COMPLAINT**

## **Summary**

This case involves plaintiff's appeals of defendant's termination for default of Contract SP0100-04-D-4031 ("Contract 4031"), a supply contract for quantities of "Anti-Gravity, Garment, Cutaway, CSU-13 B/P" ("anti-G suits" or "anti-G garments"). As stated herein, defendant's termination for default of Contract 4031 was wrongful and should be converted to a termination for convenience due to defective Government specifications and Government changes which led to the fabric ruptures experience by Derm/Buro during destructive endurance testing.

## **Introduction**

Derm/Buro has been manufacturing Anti-G Suits since 1993, during which it has manufactured approximately 60,000 suits, with no history of defects, deficiencies, rejects, or problems. The Anti-G Suits are made pursuant to the Government's Mil-Spec design (MIL-A-83406B), and MIL-C-83429B sets forth all the requirements for the fabric that must be used when manufacturing the suits. Dupont is the Government's sole-source supplier of the Nomex

fiber that meets the requirements of MIL-C-83429B. The Nomex fiber is a proprietary formula that's made by Dupont. The Nomex fiber is spun into yarn, and the yarn is then woven to make the fabric. Derm/Buro had no privity of contract with Dupont. Derm/Buro manufactured the anti-G suits completely in accordance with the Government's stringent design specifications.

In approximately March of 2002, Dupont changed its proprietary formula or process for coloration of the Nomex fiber. The change was requested by the Government to meet its spectral reflectance requirements. However, the Government never amended MIL-C-83429B to include the new spectral reflectance requirements. The post-change Dupont fiber was used to make the fabric purchased by Derm/Buro to manufacture the anti-G suits under Contract 4031 and the related Contract No. SP0100-00-D-4027 ("Contract 4027"). Derm/Buro was never notified of this change when it was made. More importantly, neither Dupont nor the Government conducted any tests on the post-change Nomex fiber to determine the effects of the physical and chemical changes that resulted from the coloration change, or whether the new fiber and fabric would be able to withstand the Destructive Endurance Testing required for g-suits under MIL-A-83406B.

As a direct result of the Dupont coloration change, Derm/Buro experienced, for the first time in its long history with the anti-G suit, fabric ruptures during destructive endurance testing. Neither Derm/Buro nor the Government had ever seen this type of fabric rupture before. The only variable was the Dupont coloration change. Derm/Buro undertook its own research and development effort to figure out the problem, and eliminated all other possible sources of the problem. All of Derm/Buro's materials were made in conformance with the Government's specifications. The evidence overwhelmingly shows that the Dupont coloration change to the Nomex fiber was the cause of the fabric ruptures that Derm/Buro experienced.

In response to the fabric ruptures, the Government modified Derm/Buro's contracts and specifications to require a heavier weight fabric. This change forced Derm/Buro to attempt to find a manufacturer that could produce a fabric at the heavier weight. The heavier weight fabric then created problems meeting the dimensional stability requirements of the specifications. Rather than accept responsibility for the problems with the specifications, the Government attempted to shift the blame to Derm/Buro. As a result of the Government's actions, Derm/Buro was delayed for more than three years and forced to essentially shut down its facilities and lay off approximately 150 employees. Over that period of time, Derm/Buro shipped only approximately 3,000 out of a possible 20,000 Anti-G Suits.

In related ASBCA claim appeals, which were heard in April 2007, Derm/Buro presented a mountain of evidence, including testimony and reports form the foremost fabric experts in the United States, showing that the Dupont coloration change altered the physical properties of the resultant fabric rendering it unable to withstand destructive endurance testing. The Government's change in the weight of the fabric then caused it to fail dimensional stability requirements. This domino effect caused by the Government's change in spectral reflectance requirements and Dupont's coloration change severely impacted Derm/Buro's ability to produce anti-G garments which could pass destructive endurance testing and meet the requirements of the Government's defective specification, and caused it to incur additional costs on Contracts 4027 and 4031 and delays of approximately forty (40) months on Contract 4031. Derm/Buro was essentially placed into the position of being the Government's "guinea pig" for testing out the new Nomex fiber. These events led to the Government's eventual termination for default of Derm/Buro Contract 4031, which is the subject of the instant action. At the time of this Complaint, the claim appeals are still pending before the ASBCA. The instant action before

your Honorable Court involve lots under Contract SPO100-04-D-4031 that were not ready for presentation at the time of appeal before the Board.

**Parties**

1. Plaintiff Derm/Buro is a corporation organized and existing under the laws of the State of Illinois, with a principal place of business located at 229 Newtown Road, Plainview, New York 11803. Derm/Buro is a closed corporation whose stock is wholly owned by Frank Guthart, President.

2. Defendant is the United States acting through the Defense Logistics Agency ("DLA"), Defense Supply Center Philadelphia ("DSCP") (referred to herein as "Defendant" or "Government").

**Jurisdiction**

3. This Court has jurisdiction over the subject appeals pursuant to 28 U.S.C. §1491, more commonly referred to as the "Tucker Act."

**Facts**

Background

4. In order to manufacture the Anti-G suit for the Government, a contractor must be qualified and be placed on the "Qualified Producers List" by demonstrating compliance with SD6.

5. Prior to Derm/Buro, Light Industries, located in Patterson, New Jersey, was the supplier of the Anti-G suit to the Government for 18 -20 years.

6. When Light Industries went out of business in 1991-1992, Derm/Buro hired its key personnel for purposes of getting qualified to produce the Anti-G suit for the Government.

7. Derm/Buro was qualified as a producer of, and placed on the Qualified Producers List for, manufacture of the Anti-G suit in 1993.

8. Derm/Buro was the first company in approximately eighteen (18) years to be qualified to make the Anti-G suit.

9. Starting in late 1993 or early 1994, Derm/Buro started to perform the first of eight (8) contracts for supply of the Anti-G suit with the United States Air Force.

10. Derm/Buro provided between 65,000 to 70,000 Anti-G suits to the Air Force, during which time Derm/Buro never failed a lot, the Air Force never rejected any of its lots, no product quality deficiency reports ("PQDRs") were issued against Derm/Buro, and there were no problems with quality reported from the field.

11. The Anti-G garments supplied by Derm/Buro to the Air Force under previous contracts were manufactured pursuant to the exact same Mil-Spec as used by DSCP on Contracts 4027 and 4031.

12. Contract 4027 was the first Contract for Anti-G suits awarded to Derm/Buro by DSCP.

13. Under Contracts 4027 and 4031, DSCP's customers or users of the anti-G garments were the United States Air Force and Navy. The anti-G garments were required to be made pursuant to the Air Force specification, and DSCP received technical direction and testing support on the anti-G garment from the Air Force and Navy.

14. Derm/Buro supplied 35,500 Anti-G suits to DSCP on Contract 4027 without a failure.

15. The Anti-G garment (formally called "Anti-G Garment, Cutaway, CSU-13B/P") is basically a two-part garment: an outer shell made up Dupont Nomex fabric, and an internal bladder.

16. The manufacturing of the anti-G garment is governed by Military Specification MIL-A-83406B.

17. The manufacturing of the Nomex fabric (formally called "Cloth, Plain and Basket Weave, Aramid"), which is used in the anti-G garment, is governed by Military Specification MIL-C-83429B).

18. The Anti-G suit is used by United States pilots when flying various aircraft (F15, F16). The suit contains a valve and internal bladders around the abdomen, thighs, and calves of the pilot are inflated during flight to protect him from G-forces.

19. The Dupont Nomex fiber required by the Contract has approximately fourteen other applications including a coverall or uniform garment which do not require destructive endurance testing.

20. The fabric supplier (i.e. Milliken) purchases the Nomex aramid fibers directly from Dupont, the Government's sole-source supplier, and then sends them off to a third party to be spun into yarn or thread.

21. Milliken then weaves the yarn/thread spun from the Nomex fibers to make the fabric used to manufacture the Anti-G suits.

22. Milliken performs various tests on the fabric, including fabric weight, dimensional stability, tear strength, flammability, in order to ensure that it meets the Government's specifications.

23. The Nomex fabric is shipped from Milliken to Derm/Buro in rolls of 100-150 yards, in widths of 56-66 inches.

24. The Nomex fabric was shipped from Milliken to Derm/Buro with test reports and a Certificate of Conformance showing that it meets the Government's specifications.

25. Upon receipt of the fabric from Milliken, Derm/Buro spreads the fabric out and performs a hand examination to endure that the fabric is perfect before it can be used.

26. The Government supplies Derm/Buro with patterns which it is required to use as guides for cutting the fabric for use on the Anti-G suits.

27. Derm/Buro purchased its bladder material from Lamcotec. .

28. Derm/Buro provided DSCP with vendor reports from Lamcotec which indicated the weight and other characteristics of the bladder material being provided .

29. After Derm/Buro manufactures the Anti-G suits, it is required to perform destructive endurance testing on the suits in accordance with the Government's specifications.

30. Section 4.7.3 of MIL-A-83406B provides as follows regarding the requirements for Destructive Endurance Testing of anti-G garments:

> 4.7.3 Endurance. The anti-g garment shall be fitted to the inanimate model specified in 4.8. The anti-g garment shall be inflated 1,000 times, in accordance with table XIV, to a pressure of not less than 15 psi and then examined for structural defects. If the anti-g garment contains any of the defects specified in 3.7.2, the anti-g garment shall be rejected. After the anti-g garment has been examined for defects, the anti-g garment shall be subjected to the leakage test described in 4.7.2.

31. Section 4.8 of MIL-A-83406B requires the following inanimate model be used during destructive endurance testing of the anti-g garment:

> 4.8 Inanimate models. Two inanimate models, each consisting of two legs and one torso, shall be required. The anti-g garments in sizes small regular and small long shall be fitted to the

> small model. The anti-g garments in sizes medium regular, medium long, large regular, large long, and large extra long shall be fitted to the large model. The inanimate models shall conform to figure 10 and table XV.

32. During destructive endurance testing, the Government representative selects two suits, at random, from Derm/Buro's lot for destructive endurance testing.

33. In order to perform destructive endurance testing, the Anti-G suits are placed on to a three-piece "inanimate model" made of wood and fiberglass consisting of two legs and a torso.

34. The Government's specification contains the requirements, including shape and dimensions, for the inanimate model Derm/Buro is required to use during destructive endurance testing.

35. The Government has inspected and measured Derm/Buro's inanimate models and found it to be in conformance with the Government's specifications.

36. Derm/Buro has used the same type of inanimate models for destructive endurance testing of Anti-G suits since 1993.

37. During destructive endurance testing, the Anti-G suit is placed on and connected to a special machine that is tied in with a series of calibrated gauges and counters.

38. Derm/Buro performed the destructive endurance testing using the same machine throughout Contract 4027, and prior thereto, with no changes being made to the machine.

39. The destructive endurance test consists of three parts: the first part is what is known as a "pre-flight" when the suit is inflated for two minutes and has to hold 12 pounds and not lose more than .5 pounds of air; next, the suit then has to do 1,000 inflations at 15 PSI; and last, a "post-flight" test, during which the same test as the pre-flight test is performed.

40. Only if and when all three parts of the destructive endurance test have been passed can the Government QAR mark a Lot as "accepted," at which time it is shipped off to the Government.

41. The two randomly-selected suits used during destructive endurance testing are stamped "Endurance tested not to be used in flight" and sent to DSCP.

Contract SPO100-00-D-4027

42. The Government reviewed and approved Derm/Buro's quality manual and procedures in 2000 prior to the award of Contract 4027.

43. DSCP awarded Contract 4027 to Derm/Buro on June 28, 2000. Contract 4027 was an indefinite quantities contract with a base year and three option years. The Contract required manufacture of seven different sizes of the Anti-G suit.

44. Derm/Buro successfully performed and completed the base year of Contract 4027 providing DSCP with somewhere between 11,190 and 11,500 anti-G suits without a fabric rupture, and delivering all of the suits on schedule.

45. Contract 4027 identified Milliken & Co. as an approved source of the Dupont Nomex fabric required for use in the Anti-G suits.

46. On June 18, 2001, DSCP exercised Delivery Order No. 2 (first option period) to Derm/Buro. Derm/Buro successfully completed Delivery Order No. 2 and made all deliveries thereunder in a timely manner.

47. On June 13, 2002, DSCP exercised Delivery Order No. 3 (second option period) to Derm/Buro for an additional 6,025 Anti G-Suits. Derm/Buro successfully completed Delivery Order No. 3 and made all deliveries thereunder in a timely manner.

48. On October 17, 2002, DSCP exercised Delivery Order No. 4 (third option period) for an additional 5,165 anti-G suits.

Dupont Changes Coloration of Nomex Fiber

49. In a March 1, 2002 memo from Frank Piecyk, Product Services Manager at DSCP, to various weavers, spinners, dyers, and contractors (Dupont Advanced Fiber Systems, Charles Craft, Inc., Pharr Yarns, Inc., Sprinfield, Milliken & Company, Duro Industries, Carter Industries, DJ Manufacturing Copr., and Propeer International, Inc.), it was acknowledged that there was a coloration change in the Dupont Nomex fabric:

> **Dupont Advanced Fiber Systems has notified DSCP that a coloration change has taken place in regards to the aramid blend fibers which construct the MIL-C-83429B Cloth. This change will not affect the final shade of the cloth, but does register a NIR signature in line with other military items. Dupont will begin production of this change in March of 2002.**

50. Notably, Derm/Buro was not provided with a copy of the March 1, 2002 Frank Piecyk Memo regarding the Dupont coloration change, nor was it otherwise advised by the Government of the coloration change.

Contract SPO100-00-D- 4027: Fabric Rupture on Lot 53 During Destructive Endurance Testing

51. On August 7, 2003, Derm/Buro experienced its first-ever fabric rupture on Lot 53 of Delivery Order No. 4 on Contract 4027. The fabric in the abdominal region of a suit ruptured after approximately 700 cycles. The rupture was in the fabric, not the bladder under the fabric.

52. The fabric rupture on Lot 53 started approximately 1 ½ inches above the sewn-in bladder tab of the garment, and tore approximately 6 to 7 inches.

53. Neither Derm/Buro nor the Government had ever seen the fabric rupture as it did during destructive endurance testing of Lot 53.

54. The destructive endurance testing of Lot 53 took place at Derm/Buro's Clearwater, Florida facility and was performed under the supervision of the Air Force as an agent and customer of DSCP.

55. Derm/Buro manufactured Lot 53 in accordance with the Government's plans and specifications. The specifications were the same for Lot 53 as they were for Lot 1 which Derm/Buro tested successfully with no fabric ruptures. There were no changes in Derm/Buro's manufacturing process from Lot 1 to Lot 53.

56. Derm/Buro used fabric from the same manufacturer (i.e. Milliken) for Lot 53 as it did for Lot 1 and all previous lots on Contract 4027. In accordance with the certificates of conformance ("COC") provided by Milliken, the fabric provided by Milliken was in total conformance with the Government's Specifications.

57. The fabric provided by Milliken was shipped to Derm/Buro on rolls containing approximately 100 to 150 yards of fabric.

58. The fabric used by Derm/Buro for Lot 53 was inspected upon receipt at its facility from Milliken.

59. The fabric that Derm/Buro used for Lot 53 was visually inspected when it arrived and no problems were found.

60. By letter dated August 13, 2003, Derm/Buro advised the Government as follows regarding the fabric rupture that occurred on Lot 53 during destructive endurance testing:

> On August 7, 2003, Lot 53 was presented to the Government QAR for submittal and quality acceptance. Two samples from Lot 53 of the Anti-G Garment, CSU-13 B/P were selected and exposed to the endurance test per Mil-A-83406B. During the performance of the endurance test Serial Number 130150, Medium Regular, failed after 780 cycles.
>
> A. Root cause of each deficiency

1. Material specification verified and COC ["Certificate of Conformance"] available for inspection.

2. Garment visual and stitch count inspection. Stitch count within 10-12 inches per inch as per specification. No other defects found.

3. All sewing operations reviewed and found to be in compliance with specifications.

4. Garment disassembled and all sewing components checked against patterns. No deficiency found.

5. Derm/Buro quality control procedures reviewed and found in compliance with Mil-I-45208 as required.

6. Small Regular garment (Lot #53) serial number 130451 endurance tested at the same time. No failure after 780 cycles.

7. Medium regular garment serial number 130201 selected for Lot #54 manufactured at the same time passed endurance test of 1,000 cycles.

Conclusion: Derm/Buro could not discover any deficiencies in components, manufacturing or quality control procedures and can only surmise the above was a production anomaly. The above referenced deficiency has never been experienced by Derm/Buro in the approximately 135-145 previous CSU-13 B/P Anti-G Garments endurance test lot submissions.

B. Action taken to correct the specific deficiency

1. As addressed above.

C. Action taken to correct and prevent recurrence of the root cause of the deficiency.

1. Derm/Buro will perform a 100% visual inspection of all CSU-13 B/P Anti-G Garments and its components.

D. Action taken to determine of [sic] other product is affected by same or similar deficiency and action taken regarding susceptible product.

> 1. To the best of our knowledge above referenced deficiency has not affected any current or past production.
>
> E. Action taken to correct the weakness, which allowed deficient product to be presented to the Government for acceptance.
>
> 1. Production management and supervisors to review all sewing operations that could affect area of deficiency. Quality Control inspectors to add additional visual and stitch inspection in area of deficiency.
>
> 2. Lot number 53 to be 100% visually inspected and all sewing specifications in area of deficiency to be reexamined.
>
> 3. 100% - 2 minute leakage test to be performed. (Serial No.'s will be available for inspection).
>
> 4. The above actions will be a 100% screening and re-inspection. All defects found will be recorded and corrected.
>
> F. Target dates for implementation of identified corrective action.
>
> 1. Derm/Buro will require 5-7 business days after Governments [sic] approval to complete correction and submit Lot #53 for endurance testing and acceptance. Corrective action has commenced as of August 11, 2003.

61. On August 21, 2003, Contracting Officer Daniel Price sent a letter to Derm/Buro requesting that Derm/Buro send fabric and/or anti-G suits from Lot 53 to Le Huyen in Texas for inspection and examination to ensure compliance with the Government's specifications.

62. Le Huyen was the cognizant engineer or technical chief for the Air Force during Derm/Buro's performance of Contract 4027.

63. Le Huyen had been working with Derm/Buro on various contract for anti-G suits since approximately 1993, during which time he attended many destructive endurance tests at Derm/Buro and was, therefore, quite familiar with Derm/Buro and its product.

64. Since neither Derm/Buro nor Milliken had any remaining fabric from Lot 53, on September 2, 2003, Derm/Buro sent completed anti-G suits from Contract 4027, including Lot 53, to Le Huyen for examination and testing.

65. Le Huyen received five tested samples of anti-G suits from Derm/Buro, as confirmed in an email from Le Huyen to Jean Rosso of DSCP dated September 16, 2003.

66. Derm/Buro was not allowed to retest Lot 53 until Mr. Huyen and Mr. Zapeda from the Air Force appeared at Derm/Buro's facility with the suits that they had received from the Lot in question.

67. Mr. Huyen and Mr. Zapeda arrived at Derm/Buro on September 18, 2003, looked over and reviewed its testing procedures, and Mr. Huyen decided that Derm/Buro should lace the suit tighter to the inanimate model than it had previously done: Le Huyen advised Derm/Buro "Let's make it very tight."

68. The Government's specification does not tell the contactor how tightly to tie the laces of the garment on to the inanimate model; it simply states that the contractor is required to fit the garment to the model.

69. Derm/Buro complied with Le Huyen's instructions by tightening the laces very tightly, Le Huyen re-tested the suit, and it passed. Since the Government QAR was present, he accepted Lot 53 on the spot.

<u>Contract SPO100_00-D 4027: Fabric Ruptures on Lots 55 & 56</u>

70. On August 28, 2003, Derm/Buro experienced a fabric rupture during destructive endurance testing of Lot 56 of Contract 4027 on anti-G garment serial number 131358 (medium-long). The fabric rupture was similar to that which Derm/Buro experienced during destructive endurance testing of Lot 53 on August 7, 2003.

71. On October 8, 2003, at the request of Government QAR Louis Brothag, Paul Lubowitz (DCMA-South Florida) went to Derm/Buro's Hialeah, Florida facility to verify the condition and accuracy of the patterns for the anti-G garments being cut by Derm/Buro. Mr. Lubowitz inspected Derm/Buro's patterns and concluded the following: **"I do not find any problems with their patterns nor markers that might cause a defective or faulty final product."** (emphasis added)

72. On October 21, 2003, during destructive endurance testing of Lot 55 on Contract 4027, anti-G suit serial number 131441 (small/long) failed at 893 cycles. The outer aramid material (Nomex fabric) developed a horizontal rupture.

73. On October 23, 2001, Derm/Buro re-screened, re-submitted, and-re-tested Lot 56 which was accepted by the Government.

DSCP Awards Contract SPO100-D 4031 to Derm/Buro

74. On October 30, 2003, DSCP awarded Derm Buro Contract 4031 for various quantities of anti-G garments.

75. On October 30, 2003, DSCP issued Delivery Order 0001 under Contract 4031 for 7,000 anti-G garments from May 30, 2004 through December 20, 2004.

Derm/Buro Experiences Second Fabric Rupture on Lot 55 (Contract 4027)

76. On November 18, 2003, Derm/Buro experienced a second fabric rupture during destructive endurance testing on Lot 55B (anti-G garment serial number 131555, medium/regular).

77. Following the fabric ruptures on Lots 53, 55, and 56, DSCP had no theories as to the cause of the fabric ruptures (except for Le Huyen's direction to tighten the laces on the garment when placed on the inanimate model during destructive endurance re-testing on Lot 53).

78. Following the fabric ruptures on Lots 53, 55, and 56, the Government QARs did not question or suspect Derm/Buro's destructive endurance testing procedures as being the cause of the fabric ruptures.

79. DSCP never issued a product quality deficiency report ("PQDR")to Derm/Buro for any reason regarding the fabric or its anti-G garment generally.

80. On November 24, 2003, at the request of the Government, Derm/Buro provided the Contracting Officer with Milliken Test Reports for all fabric used by Derm/Buro for Lots 53, 54, 55, and 56 (i.e. the fabric that ruptured during destructive endurance testing).

81. Derm/Buro wrote to Contracting Officer Dan Price on December 1, 2003 and advised that Derm/Buro had "submitted its proposal forming the instant contract under the understanding that if the Anti-G Garments were made according to the requirements of Specification Mil-A- 83406B, an acceptable product would thereby result." Derm/Buro further states that "Derm/Buro has conformed to the specification and has provided the Government with the fabric test records to use in lot manufacture," and that "[t]he supplier (Milliken), who to the best of our knowledge is the sole source of Mil-C-83429, has assured Derm/Buro that it has conformed to the cloth specification requirements in every detail." At the end of the letter, Derm/Buro asks the Contracting Officer for direction regarding the cause of the fabric ruptures

and requests that Lot 55 be accepted, and that it be permitted to proceed, since the fabric ruptures experienced did not affect form, fit, or function.

82. By letter dated December 4, 2003, Contracting Officer Price denied Derm/Buro's request for DSCP to accept Lot 55. Contracting Officer Price further advised as follows:

> …
>
> The Air Force is still reviewing the information on Lot #55, and until they provide DSCP word on their decision, the fate of that lot cannot be determined. This is a Life Support item, and as such, all avenues must be explored before a decision is made. DSCP will alert the Service of the contractor's eagerness to finalize the investigation of Lot #55.
>
> DSCP will provide the contractor with an answer upon receipt of the Services [sic] decision.

DSCP/Air Force Delays in Testing

83. By letter dated December 4, 2003, Contracting Officer Daniel Price advised Derm/Buro as follows:

> The Air Force HSW/YAPSL has requested the following material and information to further investigate and identify the cause of failure of Lot #55:
>
> 1. All vendor reports of materials used to manufacture the Anti-G Garments of Lot #55.
>
> 2. Any left over materials (possibly 5 yards each) used to manufacture the Anti-G Garments of Lot #55.
>
> 3. All previous failed samples (tested samples).
>
> 4. Four new samples (randomly selected by the Government Representative).
>
> The Air Force will investigate the failure of Lot #55 based on receiving the above requested documents, material, exhibits and will notify our office of the findings. Per paragraph 4.6.3.4 of MIL-A-83406B, after receiving the notice of cause of failure of this lot, the contractor still has the responsibility to take action to

preclude recurrence. After correction, all of the sampling tests will be repeated.

All vendor test reports, left over materials, tested samples and new samples from Lot #55 shall be sent to:

Le T Huyen
311th/YAPSL
7980 Linbergh Landing
Building 578
Brooks City Base SA, TX 78235

84. Based on Contracting Officer Price's December 4, 2003 letter, it was Derm/Buro's understanding that it was on hold and was not to proceed with any further work on either Contract 4027 or 4031 until it heard back from Mr. Price and/or Mr. Huyen.

85. By letter dated December 18, 2003, Derm/Buro indicated it would comply with the instructions in Contracting Officer Dan Price's December 4, 2003 letter to provide Le Huyen with vendor reports, left over materials, and failed samples from Lot 55. Derm/Buro also advised that upon receipt of instructions from the Government, it would contact the appropriate Government representative (QAR Lou Brothag) to arrange a date for the selection of the four random sample suits.

86. On December 22, 2003, Contracting Officer Dan Price sent a letter to Derm/Buro confirming its December 18, 2003 letter advising that all materials, reports, suits, etc. from the failed Lot 55 were being provided to Le Huyen for testing. Mr. Price also advised Derm/Buro that he had advised Le Huyen that Derm/Buro wanted to be present for and witness Le Huyen's testing.

87. On January 6, 2004, in compliance with Contracting Officer Dan Price's December 4, 2003 letter, Derm/Buro advised Mr. Price that the following was being forwarded to Le Huyen via Federal Express on January 9, 2004:

1. Vendor reports:

C.N. Clark Company
Tricor Industries
New Castle Fabrics Corp.
Townsend Machine
Coey Tanning Co., Inc.
Scovill Fasteners, Inc.
Synthetic Thread
Performance Textile
Phoenix Rope and Cordage Co., Inc.
Bally Ribbon Mills
YKK USA Inc.
Velcro USA Inc.
Lamcotec
Milliken and Co.

Previously endurance tested Anti-G garments from test date 8/21 were previously forwarded to DSCP and the following are enclosed:

| | | |
|---|---|---|
| 10/21/03 | Small Long | Serial No. 131441 |
| 11/18/03 | Small Regular | Serial No. 131702 |

88. The vendor reports provided by Derm/Buro to DSCP in January 2004, including those from Milliken and Lamcotec, indicated the weight and other characteristics of the materials being provided and certified that the material met the Government's Acceptance Specifications.

89. In accordance with Contracting Officer Price's December 4, 2003 letter, on January 15, 2004, Government QAR Louis Brothag came to Derm/Buro's facility and randomly selected four (4) garments from Lot 55 (serial #131176, size medium/long; serial #131605, size medium/regular; serial #131438, size small/long; serial #131684, size small/regular) for testing to be performed by Le Huyen of the Air Force, and the garments were airmailed to Le Huyen in Texas.

<u>Derm/Buro's Independent Investigation Into Cause of Fabric Ruptures</u>

90. At or about the time of the fabric ruptures, Doug McMullen of Milliken forwarded to Frank Guthart of Derm/Buro a copy of a March 1, 2002 memo from Frank Piecyk, Product Services Manager at DSCP, to various weavers, spinners, dyers, and contractors (Dupont Advanced Fiber Systems, Charles Craft, Inc., Pharr Yarns, Inc., Sprinfield, Milliken & Company, Duro Industries, Carter Industries, DJ Manufacturing Corp., and Propper International, Inc.) that there was a coloration change in the Dupont Nomex fabric. Specifically, M. Piecyk stated the following:

> Dupont Advanced Fiber Systems has notified DSCP that a **coloration change has taken place in regards to the aramid blend fibers which construct the MIL-C-83429B Cloth**. This change will not affect the final shade of the cloth, but does register a NIR signature in line with other military items. Dupont will begin production of this change in March of 2002.

91. Prior to the Dupont color/formulation change, Derm/Buro had never experienced any fabric ruptures during destructive endurance testing.

92. Prior to the Dupont color/formulation change, Derm/Buro had never received any product deficiency reports of any kind for its Anti-G suit.

93. Notably, DSCP never provided Derm/Buro with a copy of Frank Piecyk's March 1, 2002 letter regarding the Dupont coloration/formulation change.

94. Based on the Piecyk Memo, Derm/Buro began to suspect that the Dupont coloration change may have been the cause of the fabric ruptures it was experiencing. Up to that point, Derm/Buro had successfully produced approximately 60,000 anti-G suits using the Government's specification and had never experienced a fabric rupture prior to the Dupont coloration change. Derm/Buro felt that the Dupont coloration change was an area to explore and find out if the change was having a negative effect on the fabric's ability to withstand destructive endurance testing.

95. At or about the time DSCP advised Derm/Buro to cease production (approximately December 2003), Frank Guthart of Derm/Buro contacted Milliken (the Nomex fabric supplier) and asked if it was aware of any changes in the formulation or manufacture of the Nomex fabric and requested that it inquire with Dupont on the matter.

96. On December 9, 2003, after having communicated with Milliken on the issue, David Martin of Dupont sent an email to Derm/Buro advising that Dupont's formulation for the Nomex fiber is proprietary, but that it is made to the Government's specifications. Specifically, Martin stated the following:

> I received your request yesterday for the chemical details involved in the change of Near Infra-Red reflectance properties for Sage N303 Nomex fiber. **The chemical details of the Nomex manufacturing process and composition are proprietary and, unfortunately, I will not be able to share them**. **The fibers definitely meet our strict internal release standards and is reflected in Milliken's fabric exceeding MIL-C-83429B specifications**.
>
> We at DuPont are committed to helping you resolve this issue. As we discussed earlier this week, there are no abrasion specifications for the fabric nor do we test for them. Therefore we are actively pursuing several areas to see if we can detect any differences between the fibers that are outside our normal testing protocol that may lead to variation in abrasion differences. The findings will be reported to Milliken, our customer in the value chain, to keep everyone in the information loop.

(emphasis added)

97. During approximately December 2003, at the request of Milliken, David Martin of Dupont, along with a Mr. Barber and a Ms. Kim Sasser (director), came down to Derm/Buro's facility to inspect the failed garments to see if they could advise Milliken why the fabric ruptures were occurring. The Dupont representatives indicated at this time that Dupont continued to manufacture the Nomex fiber to the Government's specifications. Dupont also indicated at this

time that it was totally unaware of the stresses and strains that were required by the Government's destructive endurance test.

98. Dupont advised Derm/Buro that the tan-colored Nomex fiber has the lowest pigment count. Derm/Buro wanted to test the sage green and tan Nomex fabric to see how both reacted to destructive endurance testing. As such, Derm/Buro purchased thirty (30) yards of tan Nomex fabric from Milliken manufactured to the same Government Specification (Mil-C- 83429) as the sage green required under its contracts with DSCP. Derm/Buro fabricated anti-G suits on its own out of the tan Nomex fabric, and then subjected the tan suits to destructive endurance testing in accordance with Mil-C-83429. Both tan suits passed destructive endurance testing, one at 2,000 inflations and the other at 1,050 inflations, both above and beyond the 1,000 inflations required of the sage green under Derm/Buro's contracts.

99. Derm/Buro was looking for anything that could answer the question as to why it was experiencing the fabric ruptures during destructive endurance testing, so it decided to manufacture and test the tans suits at its own time and expense.

100. Derm/Buro hypothesized from the testing it with the tan suits that the less amount of pigment that existed in the material, the greater the possibility was that the suit would pass destructive endurance testing.

101. Derm/Buro also asked Milliken to perform abrasion testing on the pre-color change and post-color change Dupont Nomex sage green fabric. Derm/Buro wanted to create a test that simulated or came as close as possible to the physical actions that took place during a Destructive Endurance Test. Derm/Buro hoped that this type of test would give it an indication why it was experiencing the fabric ruptures after successful production of some 60,000 units without any ruptures.

102. By email dated February 11, 2004, Kim Sasser of Milliken advised Derm/Buro that it had conducted the requested physical testing in the flex abrasion properties of the newly formulated Dupont Nomex fabric, and that the results showed that **the fabric was "significantly different at 94% confidence level" than the fiber with fabric with the old Dupont formulation**. (emphasis added) The testing performed by Milliken was done in full compliance with the specifications on MIL-C-83429B Type II Class 6 Fabric at certified laboratories.

103. In her testing, Kim Sasser of Milliken also concluded that the sage green fabric made with Dupont Nomex fiber was "significantly different" than the tan colored fabric made with the same fibers.

104. Derm/Buro shared its test results regarding the tan suits, and those of Milliken regarding the abrasion properties, with Contracting Officer Dan Price. However, Mr. Price refused to consider them. In fact, all of Derm/Buro's efforts to try to assist and work with the Government and try to solve the fabric rupture problems during performance of the contracts were rejected out of hand, with no cooperation by the Government or willingness to work together to attempt to solve the fabric rupture problems.

105. Following the fabric ruptures, Derm/Buro also independently contacted various universities with textile knowledge to assist with the problem. First, Derm/Buro contacted Professor Mark Biden at the University of Rhode Island, who referred it to North Carolina State University and Georgia Institute of Technology.

106. Derm/Buro contacted the head of the textile department at North Carolina State University, Dr. Jan Pegram, and described the problem to her. Derm/Buro advised Dr. Pegram that Dupont had changed its coloration on the Nomex fiber. As such, Dr. Pegram advised that some form of abrasion testing needed to be done to the fabric prior to the color change and after

the color change. Derm/Buro provided Nomex fabric to Dr. Pegram at North Carolina State for testing.

107. Dr. Pegram conducted abrasion testing on the Nomex fabric, both pre and post color change, and found a major difference in the abrasion resisting of fabrics. Dr. Pegram concluded, among other things, that "the change in the dyeing procedure affected the abrasion resistance of the yarns, as evidenced by failures occurring where the yarn contacted the inflation bladder during endurance testing."

108. During the last week of February 2004, Derm/Buro contacted Contracting Officer Dan Price and advised him that Dr. Jan Pegram had obtained conclusive test results regarding abrasion properties of the pre and post color change Dupont Nomex fiber/fabric. Derm/Buro later forwarded a copy of Dr. Pegram's report to Mr. Price on March 1, 2004.

109. After providing Dr. Pegram's report, Derm/Buro contacted Contracting Officer Dan Price on several occasions to request a meeting to discuss Dr. Pegram's findings.

110. Dr. Pegram notified Derm/Buro that Le Huyen of the Air Force had contacted her about her report, and that he acknowledged that he had "never seen a fabric rupture like that experienced by Derm/Buro." Mr. Huyen inquired with Dr. Pegram about the effects of the Dupont coloration change, as well as whether the Air Force should add abrasion resistance testing to the specifications. In addition Mr. Huyen asked if the failures could be controlled since the Air Force wanted to be assured that the material change would have no effect on the garment's performance requirements. Mr. Huyen also requested further discussions with Dr. Pegram.

111. By letter dated February 25, 2004, Derm/Buro advised Contracting Officer Dan Price that is "considers the matter of the endurance testing capabilities of the fabric of such

urgency that a meeting on this matter should be scheduled as soon as possible attended by [the Government's] technical personnel." Derm/Buro also advised it would be available to meet to discuss these matters on March 17 or March 18, 2004.

Derm/Buro "Investigative Report" and Government Reaction

112. On March 1, 2004, Derm/Buro sent a letter to Contracting Officer Dan Price discussing generally the fabric ruptures during destructive endurance testing experienced on Lots 53, 55, and 56. As stated therein, Lot 55 (the last fabric rupture experienced by Derm/Buro) was being held in abeyance until the Government performed its own testing. Derm/Buro also stated that Dupont and Milliken confirmed that their manufacturing processes complies with the Government's specifications. Derm/Buro advised that it had "embarked upon its own investigation to assist the Government in determining the cause" of the fabric ruptures. Derm/Buro attached a copy of its "Investigative Report on Failures of CSU-13B/P Anti-G Garments" on Contract 4027 dated March 1, 2004. The Report provides an extremely detailed history and discussion of the fabric ruptures, Dupont's coloration change, Milliken's testing on the fabric, and North Carolina State University College of Textiles (Dr. Jan Pegram) testing on the effects of the Dupont coloration change on the Nomex fabric. Based on the foregoing, Derm/Buro provided the following "conclusion" in its report:

> Derm/Buro, Inc. the prime contractor on the CSU-13B/P Anti-G Garment for approximately 12 years has produced and delivered on or ahead of delivery schedule approximately 60,000-70,000 units to the Government without any PDR's or MDR's. **Derm/Buro had previously submitted an estimated 104 samples of the Anti-G Garment on this contract without any material failures.** To the best of our knowledge Derm/Buro has had no prior fabric failures of this nature.
>
> Even though Derm/Buro has complied with the specification, the Government's change in the chemical formulation of the fiber , which adversely affected the flex abrasion properties, breached the

> Government's implied warranty that a satisfactory product will result despite destructive endurance testing.

113. On March 3, 2004, Derm/Buro wrote to Contracting Officer Dan Price and advised that it was still waiting for direction from the Government on how to proceed in light of the information presented regarding the Dupont coloration change and the fabric ruptures experienced during destructive endurance testing. Derm/Buro stressed that it wanted to "minimize the delay being encountered in meeting the delivery schedule," and that the problems have "caused a delay in ordering the raw materials, a severe hardship upon Derm/Buro, and an adverse effect on the supply chain to the Government."

114. By letter dated March 5, 2004, Derm/Buro requested an update from Contracting Officer Dan Price regarding the various items (vendor reports of all materials, anti-G garments from test dates 10/21 and 11/18, and four new randomly selected anti-G garments) that were sent to the Le Huyen at Mr. Price's request.

115. On March 10, 2004, Eric Disla of Derm/Buro received a telephone call from Le Huyen advising that he "knew that the fabric was the problem." As such, Mr. Huyen asked Mr. Disla what he thought of instead of losing the anti-G garments in Lot 55, whether Derm/Buro could replace the bladder covering fabric with material that the Government would supply. Mr. Huyen also asked *what it would cost the Government* in labor to replace all of the fabric covering the waist bladders in the garments.

116. In an email dated March 17, 2004, Wendy Todd (Navy) advised Lloyd Stefanic (DSCP) and Le Huyen (Air Force), among others, of the results of test she had performed on the pre-coloration change Dupont Nomex fabric ("old fabric") versus the post-coloration change Dupont Nomex fabric ("new fabric"). Ms. Todd stated, in pertinent part, the following:

> US Navy obtained one yard of "new fabric" from a later Milliken production lot and subjected it to performance tests required by the specification. US Navy performed same tests on fabric of pre-dye change lot (referred to hereafter as "old fabric"). **Both fabrics failed to meet warp break strength but the new fabric also failed to meet warp tear strength. The new fabric's failure to meet tear strength indicated a specific deficiency with the yarn. Both fabrics had identical weights (4.5 oz/yd); (however) the fabric count in the fill direction was more than that in the old, indicating that the yarn mass had decreased as weight was unchanged**…
>
> …[T]he validity of the US Navy results are reinforced by third-party testing performed by Dermburo[sic], who meanwhile had conducted an investigation of its own with NC State University with Milliken's assistance…
>
> …**[T]here is sufficient evidence to suspect that there is a problem with the fabric, both for initial acceptance and for service life of the g-suits**.
>
> …

117. By letter dated March 18, 2004, Derm/Buro advised Contracting Officer Dan Price that it was still waiting for the Government's decision on its waiver request as detailed in its January 29, 2004 letter, as well as the Government's direction regarding acceptance of Lot 55. In the letter, Derm/Buro advised that until it received direction from the Government in this regard, it was "severely limited in both component procurement and production of the anti-G garment.

118. By letter dated March 24, 2004, Derm/Buro provided Contracting Officer Dan Price with another copy of the March 1, 2002 Memo from Frank Piecyk of DSCP to various parties regarding the Dupont coloration change in its Nomex fiber.

119. On March 24, 2004, Contracting Officer spoke with Le Huyen (Air Force) regarding Derm/Buro. Huyen advised Price that Lot 55 had not been accepted. During the

conversation, Price advised Huyen that "in the future it would be in his best interest not to make calls to the contractor."

120. On March 25, 2004, Contracting Officer Dan Price notified Derm/Buro that "as of now there has been no decision made concerning Lot 55," and that there would be "no DSCP decision until the Air Force has rendered their findings." Mr. Price further stated that the Air Force (Le Huyen) was still reviewing the March 1, 2004 North Carolina State report (Dr. Pegram), as well as the garment and material samples provided by Derm/Buro. According to Mr. Price, the "**cause of the material deficiency has not been established**." (emphasis added)

121. By email dated March 25, 2004, Le Huyen (Air Force) advised Lloyd Stefanic (DSCP) that he had "stopped testing of submitted samples of lot 55" because he had received Derm/Buro's investigative report. Mr. Huyen further advised that the "Navy and AF are now investigating the cause of failure in Endurance requirement of subject contract."

122. In a letter dated March 30, 2004 to Contracting Officer Dan Price, Frank Guthart of Derm/Buro acknowledged the telephone conversation between the two on Friday March 19, 2004, wherein Price advised that no decision on Lot 55 would be made until the Air Force had rendered its findings. In the letter, Derm/Buro also reminded Price that "[s]ince August 7, 2003 to date, the Government has not informed Derm/Buro the results of its testing nor has it ever informed Derm/Buro that there as a change in the dyeing process of Mil-C-83429." Derm/Buro attached to the letter a "History of Government Delay in Testing for material Deficiency" on Contract 4027.

123. In a Memo dated March 30, 2004, Contracting Officer David Johns (DSCP) acknowledged that the "supply position for this item (anti-G garment) has been placed in jeopardy as no production can commence under the new DSCP contract…"

124. By email dated April 2, 2004, Wendy Todd (Navy) advised Lloyd Stefanic (DSCP) that the Navy was going to take over the testing from the Air Force (Le Huyen) regarding the failures experienced by Derm/Buro during destructive endurance testing.

125. On April 5, 2004, Jean Rosso (DSCP) sent an email to Le Huyen (Air Force) inquiring about the status of his investigation into Derm/Buro's destructive endurance test failures:

> …
>
> We ask that you provide us in writing, what you have done do far in regards to the 339 request and our payment provided to you to perform the tests. **We cannot accept anymore delays. We must respond back to the contractor with, at the very least, status of the request for engineering action and any decisions that you have made. The contractor is threatening a law suit if we do not respond. The law suit would identify the Air Force as one of the parties involved.**
>
> **An expeditious response is required. Le, if I don't hear from you soon, I will be forced to take this to a higher level. Sorry.**

(emphasis added)

126. Le Huyen (Air Force) responded the same day to Jean Rosso's (DSCP) email of April 5, 2004. In his email, Mr. Huyen stated, *inter alia*, the following regarding the status of his investigation into the fabric ruptures experienced by Derm/Buro during destructive endurance testing:

> After reviewing "Derm/Buro's investigative on failure of CSU-13B/P Garment during destruction testing on contract no. SPO100-00-D-4027". We decided that it is not necessary to run Endurance testing on the received samples Anti-G Garments (lot #55, serial No. 131176 (size ML), 131684 (size SR), 131438 (size SL) and 131605 (size MR.). These Anti-G Garments were sent back to Derm/Buro (711 N.Myrtle Ave, Clearwater, Fl 34615, Att: Mr. Reic [sic] Disla) on 31 Mar 04. We are now investigating the cause of failure particular lot No. 55 that cited in Derm/Buro's investigative report and will take appropriate action to make sure

> that the received assets relative to contract (SPO100-00-D-4027) meet all requirements of specification.
>
> …

127. On or about April 5, 2004, Derm/Buro received back the four randomly selected suits sent to Le Huyen and the Air Force approximately three months before. The suits were inspected and no missing stitches or cut-out fabric was found on any of the suits. The bags containing the garments had been opened, but then closed back up and returned to Derm/Buro with no written report provided.

128. On April 5, 2004, Contracting Officer David Johns (DSCP) sent a Memo to the Air Force with the following chronology of what had occurred to date regarding the Air Force's examination and testing of the material and garments provided by Derm/Buro. As stated in the letter, on December 5, 2003, the Air Force requested that samples of Lot 55 be sent to Le Huyen at Brooks AFB for testing. On January 15, 2004, the suits were forwarded to the Air Force, and the Air Force, in turn, forwarded a "funded 339" shortly thereafter in order to perform testing. As noted in the letter, no written reply had been received from the Air Force regarding "final disposition of Lot 55." Furthermore, "**the Air Force never tested the suits in question per the 339 request but instead decided to rely on data submitted by the Contractor** and/or planned testing by the Navy." As such, Mr. Johns requested reimbursement for the "339," and an answer regarding final disposition of Lot 55. Mr. Johns closed his letter by stating the following:

> As I'm sure you are aware, the Navy has made a decision to perform additional G-suit testing. At the same time, **DSCP would like to have in writing, the Air Force's position on the cloth spec. and/or testing requirements contained under contract SP0100-04-D-4031. This contract represents a new award, and a decision needs to be made in the shortest possible timeframe so as to prevent supply failure ad well as prevent any possible claims being submitted by the contractor, Derm Buro, Inc.**

(emphasis added)

129. On April 6, 2004, Le Huyen (Air Force) sent an email to Dr. Jan Pegram (North Carolina State University), Derm/Buro's independent expert, regarding her findings regarding the effects of the coloration change by Dupont in its Nomex fiber. Mr. Huyen stated the following:

> It is very interesting to read your letter and reports concerning Abrasion Resistance of Textile Fabric. The AF has used Cloth, Plain and Basket Weave, Aramid (MIL-C-83429) type 6 in Anti-G Garment, Cutaway, CSU-13B/P (MIL-A-83406) since 1982. **We have not seen the failure of fabric (MIL-C-83429) as recently specified in your report. The required [sic] of color shade in Anti-G Garment CSU-13B/P is Sage Green No. 1590 (Ref Para 3.6.1 of MIL-C-83429), we have no idea how this changing affects to physical properties of MIL-C-83429 and is affected to performance of Anti-G Garment CSU-13B/P (MIL-A-83406).**
>
> We would like to set up the base line of new requirement (Abrasion Resistance) on the basic material outer shell of CSU-13B/P Anti-G Garment.
>
> Is this change can control the failure that has developed recently in our CSU-13B/P. Also We want to make sure that this change has no affect on performance/ requirements of CSU-13B/P Anti-G Garment. For your convenience, please let me know what time is available for you, so I can call and chat about this issue.

(emphasis added)

130. Le Huyen did not find any evidence of faulty manufacturing or workmanship by Derm/Buro.

131. Derm/Buro wrote to the Contracting Officer again on April 7, 2004 requesting the results of the Air Force's testing, and advising that "[t]ime is of the essence to make the necessary change to the…specification to prevent a repetition of the problems encountered under the current and recently awarded contract (Contract 4031)."

DSCP Rejects Lot 55

132. By letter dated April 16, 2004, Contracting Officer Dan Price advised Derm/Buro that he was rejecting Lot 55 with no future resubmissions (although Derm/Buro did not learn of this rejection until April 29, 2004.

133. On April 19, 2004, David Johns (DSCP) prepared a Memo to various DSCP personnel "summarizing the current issues related to the Anti-G suit" and providing a timeline/history of relevant events, including the following:

> …
>
> - In March, 2002, the cloth specification was changed by DSCP-COC to incorporate changes to the spectral reflectance requirement. A letter was sent to a number of manufacturers notifying them of change however COE was never made aware of it and apparently the Using Services were not afforded the opportunity to provide comments.
>
> …
>
> - On March 1, 2004 Derm Buro submitted a study from NC State that concluded that the change to the spectral reflectance requirements may have been responsible for the failures under Lot 55 (as well as failures under Lot 53 and 56). After receiving the Derm Buro study, the Air Force decided not to bother testing the suits and sent them back to the contractor.
>
> - In the interim, all Anti-G stock was frozen at the depot…
>
> …
>
> - DSCP sent repeated requests for final disposition of Lot 55to the Air Force. Finally, on April 5, 2004, the Air Force sent an email reply indicating that Lot 55 should be rejected…
>
> - **The Navy and the Air Force disagree on a process forward. The Navy requested samples from the Lots 53 through 59 (excluding Lot 55 as it was never accepted)**

**to perform a risk analysis on the suits given concern about the integrity of the cloth.**

- **Preliminary results of Navy testing on two lots (53 and 56) indicated breaking strength failures.**

…

- On April 16, 2004, Derm Buro notified DSCP that Le Hugyen [sic] had been trying to contact the person at NC State to discuss their test findings and also see if they can make recommendation to him on how to go forward and if they think the cloth is "safe". The personnel at NC State refused to email him back.

**CONCLUSION**

- DSCP will notify Derm Buro about the rejection of Lot 55. It is expected that Derm Buro will submit a claim in against the Government for all costs associated with the Lot given what has transpired above.

- **<u>No final decision has been made about how to proceed with the new contract [Contract 4031] (first delivery due May 2004 or of the Air Force/Navy will be willing to accept any suits from Lot 53 through Lot 59.</u> It appears that the Air Force had "bought into" the contractor's claim that the cloth change is responsible for the failures, based on the fact that they decided not to test any suits and have been emailing NC State to try to get their opinion on the matter. Moreover, Frank Guthart has indicated to us that Le Huyen [sic] of the Air Force contacted him and indicated that based on the NC State study, he thought all of the suits in the Lots in question are "bad" and not fit for use. The Navy will decide whether or not they are willing to accept suits after completion of their risk analysis.**

(emphasis added)

134. On April 22, 2004, DSCP issued Modification P00003 to Contract 4031, which added qualified labs (Milliken's lab in Spartanburg, South Carolina, Excelsior Union Plant in Union, South Carolina, and DCMC in Greenville, South Carolina) "for source sampling in

accordance with 52.246-9P44 Identification of Qualified Laboratory and Source Sampling…" The Modification also provided the Government QAR with authority to cut cloth samples from a lot and send them to the testing lab identified, and to cut another sample from the same roll of material and send it to the DSCP lab for side-by-side source sampling. Modification P00003 also states that "component lots may not be shipped to the prime contractor [i.e. from Milliken to Derm/Buro] until the DSCP laboratory accepts the shade of the material."

135. Derm/Buro met with various DSCP personnel on April 29, 2004, along with Doug McMullen of Milliken & Co. which was providing Derm/Buro with the Dupont Nomex fabric for the anti-G garments. During the meeting, Derm/Buro, once again, advised DSCP of successful destructive endurance testing it had performed on tan-colored anti-G garments. Mr. McMullen of Milliken advised DSCP at this time that the tan-colored garments would pass destructive endurance testing since the abrasion resistance exceeded that of the sage green garments required under the Contract. Derm/ Buro specifically requested that DSCP Technical Personnel attend the meeting. Completely ignoring Derm/Buro's request, No Technical Personnel Attended the meeting.

136. On May 5, 2004, DSCP approved Derm/Buro Lots 1 and 2 on Contract 4031. These suits were manufactured by Derm/Buro using the pre-coloration change Dupont Nomex fabric.

137. Derm/Buro wrote to the Contracting Officer on May 5, 2004, asking DSCP to "work toward a mutual solution," and advising that "the U.S. Air Force's decision not to take Lot No. 55 leaves it to DSCP to resolve the flex abrasion properties that affect Mil-C-82934B fabric and which will NOT meet the destructive endurance specifications under MIL-A-83406B." In an attempt to move the contracts along, Derm/Buro proposed the following: remanufacture

contract 4027 lot using higher end fabric under the specifications; and, with respect to Contract 4031, to test Mil-C-83429B fabrics with higher specification requirements than currently listed.

DSCP Changes Allowable Fabric Weight Range

138. On May 12, 2004, DSCP (Lloyd Stefanic) initiated a "Request for Engineering Support – DLA Form 339" regarding a change in the weight of the Nomex fabric, which stated the following:

> Based on recommendation and concurrence [sic] between the AF and Navy. The AF will coordinate with the Army to revise the fabric weight to 4.8-5.0 oz/sq yd for the anti-g garment in MIL-C-83249 [sic]."

139. By email dated May 13, 2004 from Contracting Officer David Johns (superior of Contracting Officer Dan Price), DSCP now advised Derm/Buro that, despite having previously rejected Lot 55, it wanted Derm/Buro to resubmit Lot 55 using "heavier fabric," and to re-mark as "Lot 61." In addition, Mr. Johns advised Derm/Buro that DSCP also wanted it to use the heavier weight fabric for Contract 4031 as well, and that **the Air Force and Navy indicted that they believe the weight range for the fabric should be 4.8 – 5.0**. (emphasis added)

140. On May 17-18, 2004, Jean Rosso (DSCP), Lloyd Stefanic (DSCP), and Contracting Officer Dan Price (DSCP) exchanged the following emails regarding the issue of DSCP's change to the weight of the Nomex fabric:

> From: Dan Price
> Sent: May 17, 2004 @ 11:03 a.m.
> To: Lloyd Stefanic
> Cc: David Johns
> Subject: Derm/Buro's most recent response
>
> Lloyd/Jean,
>
> I left a copy of Derm/Burp's most recent response on your desks. Frank has stated that he is awaiting Milliken's evaluation of the Government's fabric weight request (4.8 – 5.0)…

From: Dan Price
Sent: May 18, 2004 @ 7:44 a.m.
To: Jean Rosso
Cc: Lloyd Stefani; David Johns
Subject: RE: Derm/Buro's most recent response

Lloyd/Jean:

Is Derm/Buro's testing of 4.5 weight fabric acceptable? According to the services they recommended fabric at the 4.8-5.0 weight…I wouldn't want Derm/Buro testing 4.5 fabric when the services could come back and say that they want 4.8 as a minimum. Is Derm/Buro preceding [sic] correctly for the new contract?

From: Jean Rosso
Sent: May 18, 2004 @ 8:40 a.m.
To: Dan Price
Cc: Lloyd Stefanic; David Johns
Subject: RE: Derm/Buro's most recent response

Yes. Derm-Buro is in compliance with the current contract requirements. The current cloth spec. allows the weight of the cloth to be 4.3 to 5.0oz/sq. yd.

**The Service wants to narrow the range to the upper end for the weight of the cloth based on what Derm-Buro found through their research and that is the heavier the cloth (more pics per inch) will better fit the endurance testing that the Anti-G Suit endures**. The confidence level for successful testing is greater when using the heavier cloth.

**It may not be realistic to have such a narrow range for the weaver to meet, that is why I wanted to know what Derm-Buro and Milliken feel comfortable with and propose a wider ranger [sic] to the services.**

I believe that Milliken knows to provide Derm-Buro with better cloth (heavier) in order for this item to pass the testing.

Derm-Buro is manufacturing suits that are made with cloth that weighs in at 4.5 oz. Frank [Derm-Buro] said that he has asked Milliken to provide him with heavier cloth (4.8 oz) so he can produce suits at that weight as well.

> **Derm-Buro wants the cloth range to be 4.5 – 5.2 oz/sq. yd. Mr. Guthart (I spoke to him briefly yesterday at lunch) said he feels very comfortable with the cloth if we change it to 4.5 – 5.2 oz. He said the services' proposal of 4.8 – 5.0 is to [sic] small a target to meet. I agree.**

(emphasis added)

141. In an email dated May 20, 2004, Tara Capecci (Navy) advised various individuals/engineers from the Navy and Air Force responsible for the anti-G garment that since the material weight at the low end of the tolerance had been failing break strength testing (and destructive endurance testing), she proposed increasing the fabric weight to a range of 4.7-5.0 ounces per square yard.

142. The reason for the increased fabric weight was so that the fabric could pass destructive endurance testing in light of the Dupont coloration/formulation change.

143. The only thing that had changed in the manufacturing process for the anti-G garment which could have caused the fabric ruptures was the Dupont Nomex fiber coloration/formulation change.

144. Derm/Buro was unaware of any Government testing performed on the Dupont Nomex fiber to measure the effects of the coloration change.

145. Prior to issuing unilateral Modification P00004, the Government did not perform any testing to determine the effects of the weight increase of the fabric on its physical properties and/or whether it could pass destructive endurance testing.

146. By letter dated June 2, 2004, Derm/Buro advised Contracting Officer Dan Price, *inter alia*, that "no decision has been made by the Government to establish a fabric specification that will meet the destructive endurance testing requirements of the CSU13B/P Anti-G Suit."

147. On June 10, 2004, Dan Price (DSCP) sent an email to David Johns (DSCP) regarding, *inter alia*, the Government's decision to increase the fabric weight. In this regard, Price stated, in pertinent part, as follows:

> …
>
> **To date, there has been no definitive decision by the Government to establish a fabric specification that will meet the destructive endurance testing requirements. The suggestion on 4.8 - 5.0 by the services according to Derm/Buro's manufactures [sic] is to [sic] stringent. Frank said that Jeanie [Rosso (DSCP)] agrees with this…**
>
> **The delays in getting responses since Aug 03 has caused a financial burden on Derm/Buro according to Frank. He still is not getting any answers and he is doing all the work in trying to determine a proper fabric to meet the testing requirements…**
>
> **Is Derm/Buro doing work for the services to establish the proper material specifications? Why can't the services give us an definitive answer? In the mean time [sic], Derm Buro can't handle the financial problems caused by the delay : Payrolls, expenses, etc.**

(emphasis added)

148. On June 10, 2004, Derm/Buro wrote to Contracting Officer Dan Price and advised, *inter alia*, as follows:

> …
> 2. The Government has been sent expert documentation showing that there is a problem with the fabric specification (Report dated March 1, 2004). This occurred when the Government changed the Near infra-red reflectance properties for Sage N303 Nomex fiber (and Dupont's change of chemical components used in Nomex fiber manufacture) that changed the performance properties of the fabric so that it no longer would meet the required Destructive Endurance Test specification.
>
> 3. As of this date, no decision has been made by the Government to establish a fabric specification that will meet the

> Destructive Endurance Testing requirements of the CSU-13 B/P Anti-G Suit under Mil-A-83406B.
>
> 4. Derm/Buro has not received any Government testing data or direction on Mil-C-83429B fabric failure to meet the Destructive Endurance Testing requirement under Mil-C-83429B Anti-G Suit and the above reference contracts. (See Derm/Buro's letter of March 30, 2004)
>
> …

149. On June 10, 2004, David Johns (DSCP) acknowledged that Derm/Buro had advised that it may take up to eighteen (18) weeks to get the heavier weight fabric from Milliken once the Government made up its mind.

150. On June 14, 2004, Derm/Buro wrote to Contracting Officer Dan Price to request an extension to the delivery schedule on Contract 4031 resulting from the "Government's continuing failure to resolve the Government-created conflict between the Destructive Endurance Testing requirement under MIL-A-83406B and the Sage Green N303 Nomex fiber (MIL-C-83429B) that was caused by the Government's change to the fabric's infra-red reflective properties." As stated in the letter, Derm/Buro was requesting "a schedule adjustment commensurate with the period of time elapsing from the beginning of the contract through Government approval of the fabric specification change."

151. By email dated June 16, 2004, Wendy Todd (Navy) advised Le Huyen (Air Force) that she had spoken with Dupont who had "assured her" regarding "tightening the spec to 4.8-4.0 oz/sq yd. In the same email, Todd also acknowledged that she was speaking **directly to Milliken** regarding the Government's increase of the fabric weight.

152. By emails dated June 16, 2004, the Air Force and the Navy came to an agreement regarding increasing the fabric weight range from 4.3-5.0 to 4.8-5.0 ounces per square yard.

153. On June 17, 2004, Jean Rosso (DSCP) issued a Memo to Contracting Officer Dan Price advising that "Lot 5 and after" on Contract 4031 would require Derm/Buro to maintain a fabric weight of 4.8-5.0 ounces per square yard. As acknowledged by Rosso, **"[t]his change was coordinated with the Air Force and Navy."** (emphasis added)

154. By email dated June 18, 2004, Wendy Todd (Navy) communicated directly with Milliken asking whether it would be able to produce the fabric at the changed weight range of 4.8-5.0 ounces per square yard.

155. By email dated June 18, 2004, Doug McMullen of Milliken advised Wendy Todd (Navy) in response to her email of the same day that the **"weight increase from our previous trial fabric of 4.6 oz / sq yard will require a new warp / fill construction and can not be made using our existing MIL C 83429B Warps."** (emphasis added)

156. DSCP formally modified Derm/Buro's Contract 4031 to increase the weight of the Nomex fabric from 4.3-5.0 to 4.8-5.0 through the issuance of <u>unilateral Modification P00004</u> on June 24, 2004. The description of the modification was as follows:

> 1. The following interim change is made to MIL-A-83406B:
>
> Page 3, Para 3.4.1.1, at the end of the paragraph add: "Fabric Weight for Anti-G Garment in Mil-C-83429B shall be 4.8-5.0 ounces per square yard"
>
> This interim change applies to subject contract starting with Lot No. 3.
>
> 2. Any change in contract price resulting from this modification will be definitized by the ACO and any request for price adjustment is required to be submitted with in [sic] 30 days of receipt of this modification.

157. The Government did not perform any testing to determine the effects of the increased fabric weight prior to issuance of Modification P00004.

158. The increase in fabric weight by DSCP increased the amount that Derm/Buro had to pay Milliken (or any other supplier) for the material.

159. Milliken had never manufactured the Nomex fabric to a weight of 4.8-5.0.

160. The new material with the increased fabric weight was not something commercially available and had to be specially manufactured.

161. Derm/Buro was at a standstill and could not ship any new lots until after DSCP's change in the fabric weight had been implemented.

162. Upon receipt of Modification P00004 to Contract 4031, Derm/Buro immediately (within one week) placed a new purchase order with Milliken for the heavier weight fabric.

163. Milliken provided Derm/Buro with an initial estimate of approximately eight (8) weeks for shipment of the heavier weight fabric, however, Milliken did not get back to Derm/Buro with a new price for the increased weight fabric until September 30, 2004. The additional time was apparently needed by Milliken to research the Government's change to the specifications.

164. By letter dated June 29, 2004, Derm/Buro provided the Contracting Officer with a summary of problems experienced by Derm/Buro on Contract 4027 and 4031 as a result of the Government's defective specifications (i.e. Dupont coloration change) and changes (i.e. increased fabric weight).

165. On July 8, 2004, Derm/Buro submitted its Request for Equitable Adjustment ("REA") to the Contracting Officer in the amount of $989,268 for all additional costs incurred in the change in the fabric weight from 4.3-5.0 to 4.8-5.0 pursuant to Modification P00004 on Contract 4031. The REA also sought compensation for an increase cost of $127.53 per unit going forward on Contract 4031.

166. In addition to submitting an REA seeking compensation for its increased costs, on July 14, 2004, Derm/Buro also provided DSCP with a proposed revised schedule based on the change in Modification P00004. The proposed revised schedule showed a first shipment of garments on December 28, 2004, with the last shipment being sent to the Government on August 30, 2005. Since the Government had not performed any testing on the new fabric, Derm/Buro advised the Government that the schedule was contingent upon the revised fabric passing destructive endurance testing.

167. By letter dated July 20, 2004, Derm/Buro advised Contracting Officer Dan Price that it had not received a response from the Government to its proposed revised schedule sent on July 14, 2004, and that a new revised schedule would have to be provided if the Government did not approve the one provided by July 26, 2004.

168. By email dated July 27, 2004, Lloyd Stefanic (DSCP) asked Le Huyen (Air Force) for a response telling Derm/Buro "how the Govt came to the conclusion that going to 4.9-5.0 meets the Destructive Endurance Test required under MIL-A-83406B."

169. By email dated July 27, 2004, Le Huyen (Air Force) advised Lloyd Stefanic (DSCP) as follows regarding the Government's rationale for changing the fabric weight from 4.8-5.0 ounces per square yard:

> The 4.8 to 5.00 is still within previous weight requirements of Nomex fabric used in CSU-13B/P Anti-Exposure suits. We concur with Navy this range because it will help to make a stronger fabric (fill and warp direction) and possible increase the service life of CSU-a3B/P anti-G Garment…

170. The Government failed to respond to Derm/Buro regarding the proposed revised schedule as requested. As such, on July 29, 2004, Derm/Buro provided the Contracting Officer

with another proposed revised schedule for Contract 4031, this one showing a first shipment on February 28, 2005 and a final shipment on October 31, 2005.

171. By letter dated August 24, 2004, Derm/Buro requested that Contracting Officer Dan Price provide Derm/Buro with technical data that demonstrated that the Nomex cloth specified in Modification P00004 (increasing fabric weight range to 4.8 – 5.0 ounces per square yard) on Contract 4031 would meet the destructive endurance test requirements of MIL-A-83406B.

172. In a Memo dated August 31, 2004, Gary Trammel (Air Force) discusses the fabric ruptures experienced by Derm/Buro during destructive endurance testing. In the Memo, Trammel concludes that, in his opinion, "there is no evidence to support the Contractor's claim that the change to the NIR requirement incorporated in fabric manufactured in 2003 was responsible for the ruptures observed during lot acceptance testing at the Contractor's facility." However, the Memo fails to offer any explanation whatsoever as to what caused the fabric ruptures. More importantly, Trammel notes in his Memo the following regarding the garments he inspected from Derm/Buro:

> ***4.1 Visual Inspection of Lots 53, 54 and 56-60 Anti-G Suits.*** The anti-G suits were inspected for compliance with the specification with regard to workmanship, finished dimensions, and pattern dimensions. It was possible that if a) the bladder was oversize, b) the shell was undersize or off grain, or c) if stiching was too tight or too small, etcetera, that the ruptures could be explained. **However, the garments inspected did not exhibit any specification related deficiencies.** (emphasis added)

Trammel also refers to "End-Item Endurance Cycling" which the Government allegedly conducted on Derm/Buro's garments. It should be noted that the testing was not performed in accordance with Specifications of the Contracts regarding Destructive Endurance Testing, but rather was done on a "medical training manikin of soft rubber skin dressed in a coverall." In fact,

the Memo notes that the Government stopped the tests at 10,000 cycles as Derm/Buro's garments had outperformed the required 1,000 cycles required by the Contract.

173. Since the Contracting Officer failed to respond to Derm/Buro's various letters and proposed revised schedules, on September 3, 2004, Derm/Buro wrote to David Johns (superior of Dan Price) stating, in pertinent part, as follows:

> After a great deal of consternation, Derm/Buro is turning to you and Ms. Scheetz to secure the remedial action that to date has not been forthcoming. Derm/Buro has complied with the Contracting Officer's letter dated 6/17/04 [see R4, Tab 108] and Amendment P00004 dated 6/24/04 to provide a "revised delivery schedule against an excusable delay." Derm/Buro provided the requested delivery schedule conditioned on a corresponding increase in definitized costs to meet the requirement of the new specified cloth.
>
> Derm/Buro has been ready, willing and able to perform in accordance with Modification P00004, but has been unable to do so pending approval by the Government of the revised schedule and pricing. In fact, in order to demonstrate its commitment to the program, and to be able to proceed, Derm/Buro has offered to move forward in the absence of an agreement on revised pricing.
>
> …
>
> In addition to the Government's failure to respond to our revised schedule and pricing, we are concerned about the lack of data demonstrating testing of the new fabric. Our letter of 8/24/04 to the Contracting Officer made this point:
>
> > As of this date, Derm/Buro has not received any Government technical data that demonstrates that the Nomex cloth specified in the above-referenced modification will meet the destructive endurance test performance required in MIL-A-83406B. Please be assured that Derm/Buro will manufacture the suits in accordance with its contract specifications. However, if the Government-specified material fails the endurance test, Derm/Buro does

> not assume the risk for the cost of the Nomex cloth and any other costs directly associated with the failure of the cloth.

> The above assurance was necessary since the Government never acknowledged to Derm/Buro that if we complied with the design specifications (MIL-A-83406B) a satisfactory product will result.
>
> **To date, Derm/Buro has sent five (5) receipted letters to the Contracting Officer on the above issues without receiving a reply or an acknowledgement to any of them.**
>
> The Government's unexplained delay has had a crushing impact and far-reaching effect on Derm/Buro. In addition, the Government must realize what effect this unseemly delay is having on DSCP's ability to supply this vital Anti-G garment to the troops.
>
> …
>
> Respectfully, Derm/Buro would much prefer to resolve this problem with the procurement team. As shown above, the situation on Contract 4031 is most critical. Even though there has been an extended period of Government delay, Derm/Buro has refrained from bringing this urgent supply problem to the attention of the Commanding Officer of DSCP or other higher authority. We urgently wish to resolve this problem at the Contracting Officer level.

(emphasis added)

174. As of September 15, 2004, Derm/Buro had still not received a response from the Government (neither Contracting Officer Dan Price nor David Johns) to its various letters and proposed revised schedules. As such, on that day, Derm/Buro sent another letter with another proposed revised schedule, this one showing deliveries starting on March 31, 2005 and ending on December 31, 2005.

175. Finally, on September 17, 2004, Contracting Officer Dan Price sent a letter to Derm/Buro regarding Derm Buro's "claims" on Contract 4027 and 4031 relating to the Government's defective fabric specification and subsequent change to the fabric weight

specification. In the letter, Price alleges that it was "improper for Derm/Buro to stop work" on Contract 4031 and, with respect thereto, implements that revised delivery schedule submitted by Derm/Buro in its September 15, 2004 letter as Modification 0001/01. Price also denied Derm/Buro's REA on Contract 4031 for anything other than "material costs." With respect to Contract 4027, Price also denied Derm/Buro's claim for extra costs related to the fabric ruptures. According to Price, the Air Force (in an attached report) concluded that the fabric ruptures experienced by Derm/Buro were not caused by "the change in manufacturing process of the fiber," even though it failed to offer any explanation as to why the ruptures occurred. Attached to Contracting Officer Dan Price's September 17, 2004 letter was the August 31, 2004 Memorandum from Gary L. Trammel of the Air Force addressing Derm/Buro's claim that the coloration change in the Dupont Nomex fiber changed the properties of the anti-G garment leading to the fabric ruptures experienced during Destructive Endurance Testing. Mr. Trammel states in his letter that the anti-G suits were inspected for compliance with the specification with regard to workmanship, finished dimensions, and pattern dimensions, and it was found that "**the garments inspected did not exhibit any specification related deficiencies.** (emphasis added)

176. On October 1, 2004, Derm/Buro sent a letter to Contracting Officer Dan Price regarding, *inter alia*, proposed Modification 0001/01. Derm/Buro attached to the letter its claim for increased material costs going forward on Contract 4031, and reserved its right to submit a "further claim for the additional costs of performance…" Derm/Buro advised that it would be submitting a claim for "all other costs incurred a as result of the fabric issue in connection with" Contract 4027 and 4031. Derm/Buro objected to the language contained in the proposed Modification regarding the reason for the delay, and proposed the modification include the following language instead:

> Whereas, the contract presently provides for the following delivery schedule found on page two of this modification; and
>
> Whereas the parties have agreed to extend the delivery schedule as set forth on page three of this modification for excusable delay as more fully set forth in Contracting Officer letter dated June 17, 2004;
>
> The parties have agreed to modify the delivery schedule as set forth on page three of this modification.
>
> In entering this modification, both parties reserve their respective rights and remedies under the contract.

Derm/Buro also advised in the letter that it would proceed to order 2,000 yards of fabric (for Lot 3) at the increased weight, but that its delivery schedule was contingent upon the availability of the fabric who is the sole source of the revised weight fabric. Alternatively, Derm/Buro proposed that the Government furnish Nomex fabric to Derm/Buro as Government-Furnished Material. At the time, Derm/Buro felt that this was a "win-win situation," since Derm/Buro would not be responsible for what it considered to be a defective Government specification, and the Government would be supplying material in which it allegedly had confidence, and the tax payers would be saving a lot of money since it would reduce the price of the cost of the material. Derm/Buro also offered to warranty all of its workmanship the same as it would if it had purchased the material.

177. Contracting Officer Dan Price ignored Derm/Buro's request for the Government to provide the Nomex fabric as GFM.

178. In a letter to Derm/Buro dated October 7, 2004, Dr. Pegram of North Carolina State University responded to Mr. Trammel's August 31, 2004 Memo. In her letter, Dr. Pegram confirmed her original conclusion that the color change was related to the fabric ruptures experienced by Derm/Buro during destructive endurance testing, stating as follows:

> **Since all other processing except the colorant formulation is the same for the tan and green fabrics, we suspect that the colorant formulation can indeed affect fabric wear properties. In addition, the comparison of means tests did show a significant difference between the pre-2003 green fabric and the green fabrics manufactured in August and October of 2003.**

(emphasis added)

179. Derm/Buro provided a written response to Mr. Trammel's Memo by later dated October 19, 2004 to Contracting Officer Dan Price. In addition to rebutting Trammel's Memo, and summarizing Dr. Pegram's findings, Derm/Buro advised the Government that it had been delayed approximately thirteen (13) months (August 7, 2003 through September 17, 2004) at that time waiting for the Government to advise Derm/Buro how to proceed. As noted by Derm/Buro, the Government's delay was having a severe impact on Derm/Buro. Derm/Buro further advised the Contracting Officer that, contrary to his allegation, Derm/Buro never stopped work under its Contracts, and that it intends to continue to perform under the fabric specification as revised by the Government directing the use of a heavier weight fabric (Modification P00004).

Derm/Buro's Updated REAs/Claims

180. On October 25, 2004, Derm/Buro provided the Government with an REA/Claim for extra costs incurred on Contract 4027 in the amount of $519,367 due to the Government's defective fabric specification (labor, material, burden, travel, legal and accounting, and delay costs).

181. On October 25, 2004, Derm/Buro provided the Government with an REA/Claim for extra costs incurred on Contract 4031 in the amount of $652,809, and a cost per unit increase of $106 going forward, as a result of the Government's defective fabric specification and changes resulting from Modification P00004 (labor, material, testing, burden, travel, legal and accounting, and delay costs).

182. By letter dated December 23, 2004, Contracting Officer Dan Price partially responded to Derm/Buro's REA/Claim on Contract 4031, indicating that he believed Derm/Buro's burden rate to be 70%, profit rate 10%, and asking for additional information relating to the calculation of four (4) yards of cloth per suit.

183. By letter dated January 3, 2005, Derm/Buro responded to the Contracting Officer's December 23, 2004 letter, advising that Derm/Buro's burden rate is 145.6%, its willingness to settle for a 14% profit rate, and providing the additional detail requested regarding its calculation of four (4) yards of cloth per suit.

184. In a letter dated January 19, 2005, Derm/Buro advised Contracting Officer Dan Price that it was being hampered by DSCP's delay in paying for the increased costs resulting from Modification P00004 submitted to the Government on October 1, 2004.

185. Derm/Buro has never been paid by the Government for the extra costs provided in its October 25, 2004 REAs/Claims on Contract 4027 and 4031.

186 On November 10, 2004, DSCP issued unilateral Modification P00005 to Contract 4031 which was supposed to be a "definitization" of Modification P00004.

187. On February 14, 2005, the Government issued Modification P00006 to Contract 4031 which "represents an interim definitization of Modification P00004" of a "$4.00 per yard increase in the cost of material with the application of a 70% labor rate which equates to a $20.40 increase in the unit price of the item." The Modification notes that "[f]inal definitization will be made after completion of a DCAA audit," and that "[t]he unit price for units beginning with Lot 5…is revised to: $417.20."

Additional Delays Caused by Government Modification P00004/
Further Modification of the Contract Specifications Regarding Fabric Weight

188. By email dated February 23, 2005, Milliken, the sole source of supply of the Dupont Nomex fabric, advised Derm/Buro that based on the trials it had run to date, "the only construction of MIL C 83429B that will both meet our quality standards and meet fabric performance issues is 4.6 oz/square yard – 5.0 oz/square yard." As such, Milliken requested that Derm/Buro review this information with DSCP as soon as possible.

189. By letter dated February 24, 2005, Derm/Buro advised Contracting Officer Dan Price that Milliken could not meet the Government's change fabric weight specification of 4.8-5.0 ounces/square yard, and that it advised the only construction that could meet the Government's changed specification was fabric of weight 4.6-5.0 ounces/square yard. As such, Derm/Buro advised the Government that its specification was still flawed and needed to be revised in light of Milliken's findings. Derm/Buro further advised the Government that once the Contract was modified accordingly, it would advise of any required changes to the delivery schedule.

190. On March 10, 2005, the Government issued unilateral Modification P00007 to Contract 4031 which changed the required fabric weight to 4.6-5.0 ounces per square yard.

191. Immediately upon receiving Modification P00007, Derm/Buro advised Milliken to proceed with production of the required fabric with the revised weight of 4.6-5.0 ounces per square yard.

192. On March 10, 2005, DSCP issued unilateral Modification P00008 rescinding, without explanation, Modification P00006 dated February 14, 2005, which had provided for an interim definitization of increased material costs associated with Modification P00004.

Dimensional Stability Problems Resulting From Heavier Weight Fabric

193. Following issuance of Modification P00007, Derm/Buro successfully produced Lot 3 on Contract 4031 using fabric of weight 4.9 from Milliken. Derm/Buro was encouraged by this fact and thought that the problem had finally been rectified by the Government.

194. On March 14, 2005, Derm/Buro's Lot 4, with the increased fabric weight of 4.8-5.0, failed dimensional stability testing in both the warp and fill directions.

195. "Dimensional stability" is another word for the shrinkage properties of the fabric. The fabric was tested and rejected by the Government three times for reasons related to dimensional stability.

196. On March 15, 2005, the Government issued unilateral Modification P00009 to Contract 4031 which added spectral reflectance requirements for the Nomex fabric used in the anti-G garments. Modification P00009 appears to attempt to fix an error made by the Government in deleting the spectral reflectance requirements from the specification when it was amended on May 26, 1993. This is reflected in the description portion of the Modification which describes this error/omission:

> The Spectral Reflectance requirement to MIL-C-83429B Type II, Class 6 for Sage Green 1590 was omitted for inclusion in Amendment 2. The Service has designated this as a valid requirement and test for Amendment 2 date 26 May 1993 of MIL-C-83429B dated 26 May 1990. Amendment 2 of MIL-C-83429B is modified as found on page two of this modification.

197. Even though the Government did not amend the Specification and modify Derm/Buro's contract to add spectral reflectance requirements until March 15, 2005 when it issued Modification P00009, it had actually directed Dupont on or about March 1, 2002 to change its Nomex formulation and/or coloration in order to meet these spectral reflectance requirements. As such, **prior to the issuance of Modification P00009 on March 15, 2005, the**

**Government was actually requiring Derm/Buro to provide it with anti-G garments made of Nomex fabric with requirements outside the scope of its contracts**.

198. On March 16, 2005, Derm/Buro sent a letter to Contracting Officer Dan Price requesting a waiver of the dimensional stability requirement for Lot 4. As explained by Derm/Buro: the waiver would have no effect on form, fit, or function of the garments; Milliken had reviewed its testing procedure and found no reason to invalidate its previous test findings showing the fabric to be acceptable, i.e. made in accordance with the Government specifications; and Derm/Buro has been hampered in achieving consistent results by the Government's defective fabric specifications. To further investigate the cause of the failure, Derm/Buro requested a copy of all Government test data, as well as a retest of Lot 4 (if the waiver request was not granted).

199. By email dated March 21, 2005, Southern Mills advised Derm/Buro that Dupont, the Government's sole source supplier of Nomex fiber, had shut down its Nomex plants, had no fiber available, and could not advise when fiber would be available.

200. By email dated March 22, 2005, Milliken advised Derm/Buro that that it had still not received confirmation from Dupont on plant shutdown and fiber availability. As such, Milliken could not advise Derm/Buro of an exact date when it would be able to provide fabric that met the Government's revised specifications and requirements.

201. DSCP issued Modification P00010 to Contract 4031 on March 22, 2005, which was issued "to clarify requirements" under the Contract. Specifically, Modification P00010 clarified that Modifications "P00001 and P00009 are in effect," and any reference to MIL-C-83429B, Interim Amendment 2, Notice 1, dated 6 May 1999 is not effective for performance under this contract."

202. In an email dated March 23, 2005 to, among others, Le Huyen (Air Force), Lloyd Stefanic (DSCP), Wendy Todd (Navy), Jean Rosso (DSCP), Matthew Hebert (Navy), and Gary Trammel (Air Force), Tara Capecci of the Navy advised the "G-Suit Team" as follows regarding Derm/Buro's request for a waiver of dimensional stability requirements:

> …I do not agree with denying the waiver if this will create a backorder situation on the g-suits.
>
> I do agree that the fabric should be retested to verify the results. But of the difference between what is allowed in the spec and the testing is .24 tenths of an inch, **I cannot justify to those waiting for a g-suit that we have backorders because the suit fabric shrinks a ¼ of an inch more than it should for every 20 inches of length. They don't wash these suits**. **I don't think any of you will be able to justify a backorder situation on these suits for this reason either. This has no safety ramifications**.
>
> If our management asks why these suits are still backordered, and I tell them about this situation, I feel that I will be told to accept the suits. If necessary, this could be a situation in which the Navy will accept the material and suits made from this fabric lot.
>
> The stance that allowing this waiver will continue to promote a situation in which Derm-Buro feels that they can keep asking for waivers is understood, but I do not see it as reason enough to prevent someone from being able to fly because they cannot get a suit.

(emphasis added)

203. Despite Ms. Capecci's comments, by letter dated March 30, 2005, Contracting Officer Dan Price denied Derm/Buro's March 16, 2005 request for a waiver of the dimensional stability requirements on Lot 4 and directed that Lot 4 be re-tested.

204. As a result of the Government's refusal to grant a waiver for dimensional stability, Derm/Buro contacted other vendors in the industry to see about the possibility of manufacturing the heavier weight fabric that could meet the Government's dimensional stability requirements (even though Milliken advised there was nobody that could do it). Specifically, Derm/Buro

contacted Springs who advised it could not make material above a weight of 4.5 ounces per square yard, Performance Textile, who advised that "[t]here isn't a manufacture [sic] in this business who's going to touch that specification."

205. The Government refused to allow a waiver of the dimensional stability requirements even though the Navy's revised Specification states that the garments are <u>not</u> to be laundered.

206. Notably, the Specification which governs the Dupont Nomex fabric applies to its use in approximately fourteen (14) different applications (i.e. flight coveralls). As such, the dimensional stability or shrinkage requirement is more relevant is some uses than in others, i.e. anti-G garments which are not laundered on a regular basis.

207. On April 15, 2005, Contracting Officer Dan Price advised Derm/Buro that the material from Lot 4 failed the re-test for dimensional stability requirements (re-tested lot referred to at "Lot 4A"), and that use of the fabric from Lot 4/4A was not authorized.

208. Milliken advised Derm/Buro at or about this time that the Government was treating Derm/Buro "differently" than other contractors by refusing to allow a waiver of the dimensional stability requirements.

209. On April 19, 2005, Milliken advised Derm/Buro that its production of the Nomex fabric was being delayed by a "lack of fiber" from Dupont (the Government's sole source supplier).

210. By letter dated April 20, 2005, Derm/Buro advised the Contracting Officer of the "lack of fiber" being produced by Dupont (the Government's sole-source supplier). As such, aside from waiting for a waiver of the dimensional stability requirements at this time, Derm/Buro

advised the Contracting Officer that production of the fabric "will begin eight to ten weeks from receipt of fiber."

211. Despite the fact that Dupont was the Government's sole source supplier of Nomex fiber, by letter dated April 21, 2005 Contracting Officer Dan Price advised Derm/Buro that delays by Dupont in supplying the Nomex fiber to Milliken in not an excusable delay.

212. On May 2, 2005, in response to an inquiry from Derm/Buro, Milliken advised that Derm/Buro's order for the heavier weight fabric (4.6-5.0 ounces per square yard) had not yet been finished.

213. By letter dated May 5, 2005, Dr. Pegram of North Carolina State University advised Derm Buro as follows regarding the relationship between the Dupont coloration/formulation change, the fabric weight change, and the problems Derm/Buro was experiencing with dimensional stability requirements:

> …Because any type of material or construction change can potentially affect final properties, it is indeed possible that the increase in fabric weight effected by increasing the picks per inch could change the shrinkage characteristics. It has been shown with other fabrics that increasing the number of picks per inch can impart additional crimp and tension in the warp yarns, which can lead to fabric dimensional instability….The changes in fabric count and weight were introduced to try to correct failures in Destructive Endurance Testing that were observed after changes in the pigment coloration formula in the fibers by Government Authorized Modification. These observations illustrate the complex interactive nature of textile materials.

214. On May 9, 2005, Derm/Buro sent a letter to Contracting Officer Dan Price wherein it made a second request for a waiver of the dimensional stability requirements. As noted in its letter, Derm/Buro reserved its right to submit a future claim for costs related to the "impossibility/impracticability of consistent commercial manufacturing due to the Government's Defective Specification and Modifications (P00004 dated 6/24/04, P00007 dated 5/5/05)."

Derm/Buro advised the Government that the waiver request is based on the findings of independent PhD experts from North Carolina State University confirming that "the continuing effect of the Government's authorized chemical and weight changes prevent the fabric from meeting the Destructive Endurance Test of MIL-A-83406B and MIL-C-83429B Dimensional Stability Requirements."

215. By letter dated May 18, 2005, Contracting Officer Dan Price advised Derm/Buro that Frank Piecyk of DSCP (author of March 1, 2002 Memo regarding Dupont coloration change) had recently met with Monte Nagy of Dupont, but that there was allegedly no discussion about Dupont's plant shutdown.

216. On May 19, 2005, Dupont advised DSCP that it was shutting down its plant(s) and, therefore, production of Dupont's Nomex fiber needed for the anti-Garments would cease. Notably, DSCP failed to advise Derm/Buro of this fact (Derm/Buro learned of the shutdown through Milliken).

217. By letter dated May 24, 2005, Derm/Buro advised the Contracting Officer, among other things, that according to Milliken, Dupont and DSCP had been in contact and Dupont had communicated all fiber availability issues to DSCP. Furthermore, Derm/Buro attached a proposed revised delivery schedule to its letter (contingent upon the Government receiving the approved fabric in July 2005 and approval of Derm/Buro's latest request for waiver of dimensional stability submitted on May 9, 2005) showing deliveries starting on December 30, 2005 and ending on November 24, 2006.

218. On or about June 20, 2005, the Government denied Derm/Buro's second request for a waiver of the dimensional stability requirements for Lot 4.

219. On June 22, 2005, Derm/Buro sent a letter to Contracting Officer Dan Price asking a *third* time for reconsideration of its request for a waiver of the dimensional stability requirements on Lot 4. As stated in the letter, "Derm/Buro has raised legitimate questions involving the specification's Dimensional Stability requirement." More specifically, Derm/Buro stated that "**the Government's chemical color change and weight change are a causative factor in the present shrinkage problem and the reasons given by the Air Force for denying our waiver are not valid since Anti-G garments are unlikely to be laundered in the fashion implied by the test method that was designed for the standard specified Aramid Cloth weight of 4.3 – 5.0, not the heavier weight specified by P00004. In light of all of the above, Derm/Buro respectfully reinstates its request for approval of its waiver request**." Derm/Buro further stated that while the Government is reconsidering the waiver request, it would assist Derm/Buro in attempting to obtain cloth to meet the Government's changed requirements if the following information could be provided:

1. Provide Engineering data on revised specification (4.8-5.0 & 4.6-5.0 oz fabric) showing the effect on Anti-G Garment using fabric laundered at a water temperature of 140º.

2. Provide engineering data showing why Mil-A-83406B specifies washing of Anti-G suit at water temp not over 120º.

3. Provide data that care instructions specified in Mil-A-83406B call for machine washing.

Attached to Derm/Buro's letter was a copy of a May 5, 2005 letter from Dr. Jan Pegram (North Carolina State University) which explained the effects of the change in fabric weight on dimensional stability properties. (emphasis added)

220. By email dated June 30, 2005, Milliken advised Derm/Buro that it was having problems meeting the dimensional stability or shrinkage requirements of the Government's changed specification (see Modification P00004).

221. By letter dated July 6, 2005, Derm/Buro, once again, asked Contracting Officer Dan Price for a modification relaxing the dimensional stability requirement in light of the problems being experienced in meeting the requirement utilizing the Government's new heavier weight fabric.

222. On August 5, 2005, Derm/Buro sent a letter to Contracting Officer Dan Price, acknowledging that DSCP was still waiting for a decision from the Air Force regarding the dimensional stability waiver, and advising of Derm/Buro's efforts to locate and obtain Nomex fabric that met the Government's revised fabric weight specification:

> …Derm/Buro has contacted every known U.S. manufacturer [qualified or not] of MIL-C-83429B cloth that possibly could meet the requirements of MIL-A-83406B Anti-G Garment to obtain the necessary fabric. The following replies were received:
>
> 1. Southern Mills verbally has agreed to produce test yardage that it estimates will be completed by week ending 9/5/05. Derm/Buro will advise the Government of the results and request the addition of Southern Mills to our vendor list pending the results of the test run.
>
> 2. Letter dated July 19, 2005 from Performance Textile Company (Encl 1) states that their Vendors (2) <u>cannot produce MIL-C-83429B in conformity to the requirement of Modification P00004 of above-referenced contract</u>.
>
> 3. Milliken & Co. estimates a sample of the modified fabric can be produced by the last week of Aug 2005.

223. By email dated August 9, 2005, Jean Rosso (DSCP) acknowledged to David Johns (DSCP) (in reference to the status of the dimensional stability waiver request) that "as we

all have dealt with the Air Force and navy, they can't agree between themselves on certain issues."

224. By email dated August 9, 2005, David Johns (DSCP) advised Jean Rosso (DSCP) that, with respect to Derm/Buro's request for a waiver of the dimensional stability requirements, "I'm thinking we don't talk to him [Derm/Buro] at least until we get an answer to the Army 339 and the test results on the Southern Mills cloth."

225. In an email dated August 15, 2005, Southern Mills confirmed that there was a lack of Nomex fiber from Dupont:

> As discussed, DuPont has been supplying fiber based on allocation to DOD contract #s for all of 2005. This process continues even now. Typically, DuPont has been able to ship fiber once a DOD contract has been awarded in 6-10 weeks from the date of order. However, that varies given supply constraints at DuPont. Once we receive fiber, we can produce fabric in 7-9 weeks dependent upon processing demands and scheduling.

226. By letter dated September 1, 2005, Derm/Buro advised Contracting Officer Dan Price as follows regarding the Government's lack of response and delay in resolution of defective specification and delay issues:

> On August 24, 2004 [sic], Derm/Buro replied to your letter of August 22, 2005 specifically stating that DSCP had not provided any information to our three letters dated June 22, 2005, July 6, 2005 and August 5, 2005. Your fax of <u>June 24, 2005</u>, stated that DSCP was awaiting an Air Force decision. As you can see from the dates of our letters and the date of your fax, that more than 60 days has expired from our first letter and 60 days is about to expire from our second. Our August 24th letter demonstrated that DSCP continuing delay was directly contract to your statement that you were "<u>working to provide Derm/Buro with an expeditious reply.</u>"
>
> It now appears that our complaint has fallen on deaf ears. Derm/Buro is exerting its best effort to perform on above contract under an impossible/impracticable military specification at a ruinous loss to the company. This information is needed to perform on the contract and is unrelated to the ASBCA claims that

> Derm/Buro had been constrained to file occasioned by the aforementioned defective specification.
>
> It would seem that DSCP and the Air Force would share this same sense of urgency. Particularly in view of the perilous short supply of the Anti-G Garment. The admonition was referenced in our August 24th letter but apparently has no effect on getting "an expeditious reply".
>
> Derm/Buro looks forward to a prompt full reply to its three letters referenced above <u>by return mail/e-mail</u>.

227. On September 7, 2005, Derm/Buro wrote to William J. Kenny, Executive Director of Business Operations at DSCP, seeking his immediate assistance with Derm/Buro's inability to perform the Contract due to the Government's defective specifications, changes, and delays.

228. By email dated September 7, 2005, Contracting Officer Dan Price asked Air Force Capt. Abel Carreiro to "[p]lease keep us [DSCP] updated on the status of the limited acceptance of Derm/Buro's waiver request on Dimensional Stability (7 lots = 3500 suits)." Mr. Price also states the following regarding the delay in Air Force response:

> As you can see from the attachment, Derm/Buro continues to write correspondences [sic] highlighting are [sic] slow response times and extremely low stock position. Anything you can do to speed up the process will be greatly appreciated.

229. In an internal DSCP Memo dated September 8, 2005, Director of Contractor Thomas S. Wells makes, *inter alia*, the following findings regarding the problems Derm/Buro is experiencing with the Dupont Nomex fabric:

> …
>
> - Derm/Buro is at a **work stoppage** due to a conflict over the revised Nomex fabric uses [sic] to produce these suits
>
> …

> - DLA is completely out of stock on all sizes of the CSU-13 B/P Anti-G Garment
>
> …
>
> - Anti-G suits have thus far failed Destructive Endurance Testing. **There has been no report of failures resulting to the performance requirements of the garment in the field**.
> - Contractor continues to be at a **work stoppage due to the non-conforming Nomex fabric**
>
> …
>
> -- Contractor extremely frustrated with lack [sic] resolution-issue has been open since June 2003
>
> …

(emphasis added)

230. By email dated September 12, 2005, Terri Scheetz (DSCP) asked Jean Rosso (DSCP) the following regarding the Air Force's response on the dimensional stability waiver issue:

> Jean - Where are we on the AF response? It has been several weeks now. Do I need to contact someone? Terri

231. On September 13, 2005, Jean Rosso (DSCP) responded to Terri Scheetz (DSCP) inquiry regarding the status of Air Force's response regarding the dimensional stability waiver issue:

> The Air Force was supposed to reply to us last Friday. They failed to do so.

232. By email dated September 14, 2005, Contracting Officer Dan Price advised Terri Scheetz (DSCP), David Johns (DSCP), Jean Rosso (DSCP), and Lloyd Stefanic (DSCP), as follows regarding the status of the waiver regarding dimensional stability:

> …Captain Carreiro said [sic] told him that the waiver letter is still going the chain for signature.

233. On September 20, 2005, William J. Kenny, Executive Director of Business Operations at DSCP, wrote to Derm Buro and advised as follows:

> This responds to your September 7, 2005, follow-on letter concerning the Defense Supply Center Philadelphia's non-responsiveness to contract performance questions. I understand your concerns about the length of time it sometimes takes to provide specific answers. However, we must be responsive to our customers [sic]needs and ensure that their requirements are met. We hope to respond to some of your questions within the next week. As a result of your appeal to the Armed Services Board of Contract Appeals (ASBCA) which concerns the other issues referred to in your letter, it would still be inappropriate for me to comment at this time.

234. By email dated September 21, 2005, Contracting Officer David Johns (DSCP) advised Jean Rosso (DSCP), Lloyd Stefanic (DSCP), and Daniel Price (DSCP), of the following regarding the status of the dimensional stability waiver/deviation issue and the Air Force "cleaning up" of the Anti-G garment specifications:

> Just wanted to keep you in the loop on what is going on. Had a telecon with David Manchester (he is the GS14 down at Brooks, AFB) regarding the delay in getting the deviation for the 3,500 suits for dimensional stability. He brought Capt. Carreiro in because he wasn't to [sic] familiar with what is going on. Capt. Carreiro indicated that the deviation request hadn't gone through the control board yet but he hoped to have the deviation letter to us next week.
>
> While they were on the phone, **the Capt. Also mentioned that they have an Engineer who is going to work on nothing but cleaning up the Anti-G spec.** (he wouldn't say who it was…just kept calling him/her the "Engineer"…I'm assuming its [sic] not Le Huygen [sic]). The scary thing is he said that they were projecting on possibly getting the spec. cleaned up by January (with publication no later than September 2006…yikes!). He said he would coordinate with you guys every step of the way and still expects to come up next month. I'm currently working up an 1883 to see what kind of impact not having the spec. until January will have on the supply position and will be sending it down there to try to speed the process up if at all possible…

(emphasis added)

235. By letter dated September 22, 2005, Capt. Carreiro (Air Force) advised the Government "G-suit team" that the Air Force had approved issuance of a deviation form the specification to relax the dimensional stability requirements of the anti-G garment fabric. As stated in the letter, the deviation "relaxes the dimensional stability requirement of fabric produced IAW Specification MIL-C-83429B from 4.0% warp and 1.5% fill to 5.0% warp and 3.0% fill for the production of CSU 13-B/P anti-g garments." The deviation expired upon the completion of 3,500 suits (7 lots of 500) or September 30, 2006, whichever occurred first.

<u>DSCP Issues Deviation Regarding Dimensional Stability Requirements</u>

236. On September 27, 2005, Contracting Officer Dan Price advised Derm/Buro that he had granted a "deviation" waiving the dimensional stability requirements for the anti-G garment. In his letter to Derm/Buro, Mr. Price stated, in pertinent part, the following:

> In response to your letters requesting a waiver from the Dimensional Stability requirements of MIL-C-83429B Aramid Cloth, the Air Force has provided the following:
>
> - The lack of available fabric manufactured in accordance with dimensional stability standards found in Specification MIL-C-83429B, Cloth, Pail and Basket Weave, Aramid, has significantly limited production of the CSU-13B/P, Anti-G Garment. As a result, a deviation is being issued to allow production of a limited number of Anti-G Garments using available fabric in order to alleviate a critical shortage of garments for the warfighter.
>
> - The deviation to Specification MIL-A-83406B, Anti-G Garment, Cutaway, CSU-13B/P, Amendment 4, Dated 16 November 1998, relaxes the dimensional stability requirement of fabric produced IAW Specification MIL-C-83429B from 4.0% warp and 1.5% fill to 5.0% warp and 3.0% fill for the production of CSU-13B/P Anti-G Garments.

- Lots produced under this deviation must be clearly marked on the identification label with the letters DEV following the lot number.

- The deviation expires upon the completion of production of 3,500 Anti-G Garments or 30 September 2006, whichever occurs first.

237. Contracting Officer Dan Price's issuance of the deviation granting a waiver of the dimensional stability requirements was issued approximately between eight and nine months after Derm/Buro had submitted Milliken fabric lot number four, which had similar dimensional stability numbers and had been rejected by the Government three times. During this period of time, Derm/Buro was unable to manufacture and/or ship any anti-G garments to the Government.

238. The reason for the issuance of the deviation waiving the dimensional stability requirements was the direct result of the Government's change of the fabric weight, which was the direct result of the Dupont coloration change in the Nomex fiber.

239. Derm/Buro never experienced a dimensional stability problem with the original fabric specification requiring a fabric weight of 4.3-5.0 ounces per square yard.

240. Following the Government's issuance of the deviation waiving the dimensional stability requirements, Derm/Buro was able to get another supplier, Southern Mills, certified as a qualified supplier of the Nomex fabric required on its Contract.

241. On September 27, 2005, the Government issued unilateral Modification 0001/05 to Contract 4031 which deleted the dimensional stability requirements in accordance with the Government's September 27, 2005 letter.

242. On September 27, 2005, the Government issued unilateral Modification 0001/06 to Contract 4031 which established a revised delivery schedule commencing on March 31, 2005 and ending with a delivery on December 31, 2005.

243. On September 27, 2005, the Government issued unilateral Modification 0002/01 to Contract 4031 which established a revised delivery schedule commencing on February 1, 2006 and ending with a delivery on December 29, 2006.

244. By letter dated September 30, 2005, Derm/Buro acknowledged Modification 0001/05 deleting the dimensional stability requirements, and stating the following objections to said Modification: any alleged "delinquencies" are the fault of the Government, not Derm/Buro, since Derm/Buro has presented "overwhelming evidence from a number of Ph.D textile experts that the Government's change to the specification [i.e. Dupont coloration change to meet Government IR requirements] is the root cause of the delinquency"; the schedule extension is not necessarily "fair and reasonable" since a "realistic mutual schedule cannot be determined until Derm/Buro receives a firm commitment of material that has been correlated tested by DSCP before the fabric supplier can ship to Derm/Buro"; and the modification and delays in its issuance have caused Derm/Buro to incur additional costs.

245. On October 19, 2005, Derm/Buro sent a letter to Contracting Officer Dan Price advising that "[a]fter intensive investigation, Derm/Buro has been able to ascertain that Southern Mills and Milliken and Co. are the only vendors to have agreed to attempt to manufacture under the Government's modified specification and deviation for the production of MIL-C-83429B Nomex fabric subject to" certain conditions. Derm/Buro advised that it had been unable to confirm a date with Southern Mills by which it can have the fabric manufactured and samples sent to DSCP for correlation testing. Derm/Buro further advised in the letter that Milliken was being delayed by Dupont, and that it does <u>not</u> have a confirmed date from Milliken for shipping of the fabric.

246. On October 25, 2005, Derm/Buro pre- and post- Dupont coloration change samples of fabric and anti-G garments, as well as samples of tan-colored fabric, to Dr. Krishna Parachuru at the Georgia Institute of Technology for independent comparison and testing.

247. By letter dated November 3, 2005, Derm/Buro advised Contracting Officer that it had not received a response to its September 30, 2005 and October 19, 2005 letters addressing "urgent matters concerning the performance of" its Contract.

248. On November 3, 2005, Derm/Buro forwarded two additional Requests for Equitable Adjustment ("REAs") to Contracting Officer Dan Price on Contract 4031 seeking compensation for continuing delays and additional costs related to the Government's defective specifications and changes (Modification P00004), one in the amount of $187,654.03 for the period of time from October through December 2004, and the other in the amount of $366,136.56 for the period of time from January through August 2005.

249. By letter dated November 8, 2005, Derm/Buro requested that Contracting Officer Dan Price advise regarding the status of Contract 4031. Specifically, Derm/Buro stated the following:

> …
>
> Derm/Buro has continually asked the Government for direction and data on the above referenced contract but has not received definitive responses to its question concerning on-going contract administration issues vital to its continued performance on the contract. The latest list of unanswered performance type issues on which Derm/Buro needs immediate resolution are:
>
> 1. Unilateral Imposition of an Unrealistic Delivery Schedule totally at odds with the existing circumstances outlined to you.
>
> 2. Final definitization of costs accrued by Derm/Buro pursuant to your Modification P00004 dated 6/24/05.

> 3. Granting Dimensional Stability deviation of limited use to Derm/Buro despite the problems that the textile suppliers are having in meeting the Dimension [sic] Stability requirement.
>
> 4. Request for Progress Payments.
>
> …
>
> As is evident from the above, <u>the above issues affect current contract performance and are unrelated to Derm/Buro's claims before the ASBCA.</u> Derm/Buro must reluctantly conclude that your failure to administer the contract in good faith amounts to a breach of the implied cooperation that is required by a Contracting Officer.

<u>Further Government & Dupont-Caused Delays</u>

250. On November 8, 2005, Derm/Buro wrote to Contracting Officer Dan Price and advised, *inter alia*, that "…Dupont had to stop its run of the Government specified Sage Nomex fiber caused by quality problems it was having manufacturing the Government specified fiber." Derm/Buro reminded Mr. Price that Dupont is not its subcontractor, and therefore the Government is responsible for all Dupont-caused delays for, *inter alia*, the following reasons: no privity of contract between Derm/Buro and Dupont; Dupont is the sole source supplier of Nomex fiber to the Government; Dupont has a proprietary interest in the process and composition of Nomex fiber; and Dupont is manufacturing Nomex fiber pursuant to a Government specification.

251. In a Memorandum dated November 9, 2005, Le Huyen (Air Force) confirmed that "DSCP stopped the testing [Derm/Buro Lot 55, Contract 4027] due to Derm/Buro's discovery of the cause of the failures (Jan Pegram letter dated 25 Feb 04)," and that the four "untested" samples were sent back to Derm/Buro on March 31, 2004 and received by Derm/Buro on April 5, 2004.

252. On November 14, 2005, Derm/Buro advised Contracting Officer Dan Price that Milliken has advised that Dupont had a complete shade failure on October's Sage Green 1590

Nomex fiber run. As a result, Milliken can only estimate that Dupont will produce and ship the ordered Sage Green 1590 Nomex for delivery in December.

253. By letter dated November 28, 2005, Derm/Buro notified Contracting Officer Dan Price that Southern Mills' best estimate for the receipt of Sage 1590 Nomex fiber from Dupont, the Government's sole source supplier, was January of 2006. Based on this fact, Derm/Buro advised that it projected an estimated production time based on the following: Southern Mills' estimated production of cloth ten (10) weeks after receipt of the Dupont fiber; submission of Lot fabric to DSCP for correlation and testing and approval – additional thirty (30) days; and Derm/Buro's production after receipt of the approved fabric – an estimated time of eight (8) to ten (10) weeks. Based on the foregoing, Derm/Buro advised the Government that the unilateral delivery schedule contained in Modification 0001/06 and Modification 0002/01 is unrealistic an cannot be met.

254. By letter dated December 6, 2005, Milliken advised Derm/Buro that its production of Nomex fabric has been delayed due to Dupont fiber production delays in October and November 2005. As such, Milliken advised that fiber originally scheduled for Derm/Buro's December fabric order will not be ready until late January or early February 2006.

255. On December 9 2005, Derm/Buro once again advised Contracting Officer Dan Price of the delays being caused to its ability to obtain fabric by Dupont's delays in production of Nomex fiber. In light of the delays being caused by Dupont and the Government's changes to the specifications for the anti-G suit, Derm/Buro presented the following options to the Government:

> 1. Modify or allow a deviation of the specified Destructive Endurance Test in limited controlled numbers of test lots for future evaluation.

> 2. Derm/Buro would produce a limited number of anti-G garments manufactured using tan-colored Dupont Nomex fiber and fabric.

256. In a December 23, 2005 Memorandum, Jean Rosso (DSCP) rejected Derm/Buro's two proposed options to deal with the problems caused by the Government's defective specifications. **Notably, in rejecting Derm/Buro's proposal to produce a limited number of tan-colored anti-G garments for testing, Rosso stated that "the affects [sic] of using an unauthorized chemical/coloration are unknown" and "further investigation would be required before approval."** (emphasis added)

257. By letter dated January 17, 2006, Derm/Buro asked Milliken if was possible to manufacture Nomex Sage Green 1590 using Dupont's aramid blend fibers "with the same coloration formula and the same physical chemical & mechanical properties that existed prior to the color change announced from DSCP dated March 1, 2002."

258. Derm/Buro wrote to Contracting Officer Dan Price on January 25, 2006 asking for a realistic delivery schedule taking into account the delays occasioned by the Government's defective specifications and by the unavailability of fiber and fabric. Derm/Buro also asked for a DCAA audit of its extra costs incurred as a result of Modification P00004 and the subsequent "interim modification."

259. On March 1, 2006, Milliken advised Derm/Buro in response to its January 17, 2006 letter that Dupont has indicated that it "makes only one fiber that meets the military specification MIL-C-83429B" (i.e. it cannot make the Nomex Sage Green 1590 that existed prior to the color change announced in Frank Piecyk's March 1, 2002 Memo.

260. DSCP issued Modification P00012 on March 6, 2006 approving Southern Mills as a laboratory for Dimensional Stability testing.

261. By letter dated March 13, 2006, Derm/Buro advised Contracting Officer Dan Price, *inter alia*, that the Government has been in possession of Derm/Buro's cloth sample (Milliken Lot#5) for source sampling since January 23, 2006 "with no report of correlated testing being conducted." As such, Derm/Buro asks the Government to advise either that it has waived correlation testing of the Milliken cloth or to advise when correlation testing has been completed. Until then, Derm/Buro advised that it is "being further delayed from performing the contract." With respect to Southern Mills fabric, Derm/Buro advised that the Government has been in possession of the same since February 10, 2006. As such, Derm/Buro asked that the Government move ahead with correlated testing of the Southern Mills fabric, and until then Derm/Buro "is being further delayed from performing on the contract."

262. By letter dated March 29, 2006, the Government requested to Derm/Buro that "[g]iven that passing cloth is now available, please provide your revised delivery schedule" by close of business on April 3, 2006.

263. On March 30, 2006, Derm/Buro responded to the Government's March 29, 2006 letter, stating, *inter alia*, that "Derm/Buro is unable to comply with your request for a revised delivery schedule," and requesting that the Government consider the following factors in this regard:

> 1. The extensive delay in receiving approved Government-modified fabric (P00004).
>
> 2. The critical life support requirements of CSU-13B/P, Anti-G Suit.
>
> 3. Receipt of information as to component availability and delivery from the specified component manufacturers.
>
> 4. The 14-month delay in the Government's acceptance of modified material.

> 5. The start-up time required for commercial production in light of the above-described delay.

In light of the foregoing, Derm/Buro advised that as soon as it received the Government's reply concerning the apparent discrepancy between the test reports of Milliken and the Government, and as soon as it is able to construct a reasonable time frame in the light of the aforementioned factors, Derm/Buro will promptly respond with a workable revised delivery schedule.

264. By letter dated April 3, 2006, Derm/Buro provided the Government with a detailed chronology of Milliken Lot#5 fabric, as well as a history of Southern Mills Lot#1 fabric. Based on the information provided, Derm/Buro advised that "neither Milliken & Company nor Southern Mills ever delayed the submission of required samples and test data to the DLA lab."

265. On April 7, 2006, Derm/Buro wrote to Contracting Officer Dan Price regarding: (1) a proposed revised delivery schedule; and (2) a request for DCAA audit on its extra costs incurred as a result of Modification P00004 and all subsequent related Modifications (P00005, 0001/02, 0001/04, P00006, and P00008). With respect to schedule, Derm/Buro provided a proposed revised delivery schedule of 3,500 anti-G garments (as modified by Modification 0001/05 dated September 24, 2005, i.e. deviation) providing for shipments starting on August 31, 2006 and ending on February 28, 2007, <u>contingent upon</u> the following:

> (1) Derm/Buro receiving Lot# 5 Government Modified approved fabric from Milliken & Co. by 14 Apr 06.
>
> (2) Derm/Buro receiving Lot # 1 Government Modified approved fabric from Southern Mills [by] 14 Apr 06,
>
> (3) Each fabric lot having DSCP's written approval for use on Contract SP0100-04-D-4031 commencing with above-referenced Lot #5.

266. On April 24, 2006, Derm/Buro advised Contracting Officer Dan Price that it could not provide a realistic delivery schedule until, *inter alia*, the Government provided

Derm/Buro with: (1) From 1222 on Verification testing of Milliken Lot #5 fabric; and (2) Form DD 1222 on Verification Testing for Southern Mills Lot #1.

267. On May 18, 2006, DSCP issued unilateral Modification 0001/07 to Contract 4031, which deleted page 2 of Modification 0001/05 dated September 27, 2005 and replaced with a deviation from the dimensional stability requirements of MIL-C-83429B until December 31, 2007.

268. On May 18, 2006, DSCP issued unilateral Modification 0002/02 to Contract 4031, which added a deviation from the dimensional stability requirements of MIL-C-83429B until December 31, 2007.

269. On May 22, 2006, Contracting Officer Dan Price requested Derm/Buro to provide "a revised delivery schedule without contingencies" by not later than May 26, 2006.

270. On May 24, 2006, Derm/Buro wrote to the Contracting Officer regarding various contract administration and performance issues. In the letter, Derm/Buro advised, *inter alia*, that "the major issues raised in our above-listed letters were not addressed," and, as such, it reiterated its request for consideration and reply of the same. It was Derm/Buro's impression at this time, form the "massive letter writing" campaign that had developed on an ongoing contract, that the Contracting Officer was not acting in good faith. Conversely, Derm/Buro felt that it was doing everything it could possibly do to move the contract along.

271. On June 5, 2006, Contracting Officer Dan Price wrote to Derm/Buro responding to its May 24, 2006 letters regarding various contract administration and performance issues. Price advised Derm/Buro that "Government verification test results are not a pre-requisite to accept source material for the production of Anti-G Suits," and as such, requested a "revised

delivery schedule without contingencies no later than its self-imposed deadline of the week of June 5, 2006."

272. By letter dated June 7, 2006, Derm/Buro responded to Dan Price's June 5, 2005 letter regarding various contract administration and performance matters. Derm/Buro advised that it would submit "a revised delivery schedule without stated contingencies" as requested taking into account the circumstances existing at that time (i.e. absence of a higher priority rating, availability of sole-source components required under MIL-A-83406B, shortages of key raw material, sole source supply interruptions (i.e. MIL-C-83429B fabric that was not available to contract specifications for approximately fourteen (14) months), and excessive Government delay in issuing Government Acceptance test reports.

273. On June 8, 2006, Derm/Buro provided Contracting Officer Dan Price with a Proposed Revised Delivery Schedule "without contingencies" as requested for Revised Delivery Orders 0001 and 0002 under Contract 4031. The proposed revised delivery schedule for Delivery Order 0001 provided for deliveries starting on August 31, 2006 and ending on April 30, 2008. The proposed revised delivery order for Delivery Order 0002 provided for deliveries starting on June 28, 2008 and ending on February 28, 2009.

274. On June 14, 2006, DSCP issued bilateral Modification 0001/08 to Contract 4031 revising the delivery schedule to provide for deliveries starting on August 31, 2006 and ending on April 30, 2008.

275. On June 14, 2006, DSCP issued bilateral Modification 0002/03 to Contract 4031 revising the delivery schedule to provide for deliveries starting on June 28, 2008 and ending on February 28, 2009.

276. By letter dated June 14, 2006, Contracting Office Dan Price responded to Derm/Buro's June 8, 2006 letter, advising that that verification testing was performed on Southern Mills fabric Lot #2 and attaching a corrected DD Form 1222 for the same.

277. On June 20, 2006, Derm/Buro wrote to Contracting Officer Dan Price regarding Government Acceptance Testing, Government Verification Testing, and Correlation Testing of fabric for use under Contract 4031. Derm/Buro provided the Contracting Officer with its understanding of these requirements, namely that since the Government's test results are used for acceptance/rejection purposes, it is reasonable for Derm/Buro to wait for Government verification test results before commencing production.

278. By letter dated July 14, 2006, Derm/Buro provided the Contracting Officer with a breakdown of its increased material costs ($32.75 per unit) resulting from Modification P00004, and requested a contract modification and DCAA audit of the same.

279. By letter dated August 1, 2006, Derm/Buro provided DSCP with corrected definitized increased material costs resulting from Modification P00004.

280. On August 10, 2006, DSCP issued bilateral Modification P00013 to Contract 4031 establishing accelerated shipments by Derm/Buro at an interim billing price of an increase of $32.31 per unit (for increased material costs resulting from unilateral Modification P00004) subject to verification by DCAA audit.

281. By letter dated August 11, 2006, Derm/Buro advised DSCP that it planned to submit Lot 5 to the Government on August 31, 2006 at 10:00 a.m. at its Clearwater, Florida facility.

282. On August 28, 2006, DSCP issued unilateral Modification 0001/09 to Contract 4031 increasing the cost of Delivery Order 0001 by $173,310.84 due to increased material costs associated with Modification P00004.

283. On August 28, 2006, DSCP issued unilateral Modification 0002/04 to Contract 4031 increasing the cost of Delivery Order 0002 by $77,544 due to increased material costs associated with Modification P00004.

284. By letter dated December 13, 2006, Contracting Officer Dan Price advised Derm/Buro that its Lot 8 fabric had failed dimensional stability testing, but was being accepted as a "minor nonconformance" under a waiver with a reimbursement of $758.50. (R4, Tab 360)

Fabric Rupture on Lot 7 (Contract 4031)

285. By letter dated December 15, 2006, Derm/Buro advised the Contracting Officer that it planned to submit Lot 7 to the Government on December 29, 2006 at 10:00 a.m. at its Clearwater, Florida facility.

286. On December 29, 2006, Lot 7 failed Destructive Endurance Testing due to a fabric rupture on the inside abdomen area of G-suit serial number 103056. Due to the failure, Lot 7 was rejected by the Government QAR.

287. The fabric rupture that occurred was of the same nature and in the same general location as the fabric ruptures that occurred on Derm/Buro Lots 53, 55, and 56 of Contract 4027.

288. By letter dated January 5, 2007 to Contracting Officer Dan Price, Derm/Buro addressed the fabric rupture that occurred during Destructive Endurance Testing of Lot 7 ("CAR Response"). With respect thereto, Derm/Buro stated the following regarding the failure and the history of the fabric (MIL-C-83429B) and the corrective actions taken:

- **The rupture that occurred in Serial #103056 is the same type problem experienced under Contract SP0100-00-**

> **D-4027, on Lots 53, 55, and Lot 56. The difference being Milliken & Company manufactured the fabric in the previous failures while Southern Mills (Tencate Protective Fabrics) manufactured the fabric of Lot 7 of Contract No. SP0100-04-D-4031.**
>
> - **In addition to the vendor's submission of Certificate of Compliance, DSCP and DLA labs tested and approved the fabric for Source Sampling, Shade Approval and Verification Testing. Documentation will be provided upon request.**
> - **The current failed tested suit was fabricated under fabric change Modification No. P00004 issued 6/24/04 and Dimensional Stability Deviation Modification No.0001/05 issued 9/27/05.**

(emphasis added) Derm/Buro further advised in the letter that it "has reviewed all components and manufacturing protocols and has determined that Lot No. 7 of Contract SP0100-04-D-4031 was manufactured **as specified by MIL-A-83406B**." Derm/Buro also advised that it would: (1) re-inspect 200 CSU-13B/P size M/L of Lot 7; and (2) perform visual, dimensional, and two minute inflation tests. Finally, Derm/Buro requested authorization to resubmit Lot No. 7 of Contract 4031 on January 11, 2007 or January 18, 2007. (emphasis added)

289. On January 10, 2007, Derm/Buro submitted its Corrective Action Response to the Government regarding the fabric rupture that occurred during destructive endurance testing of Lot 7. As stated by Derm/Buro therein:

> Derm/Buro has reviewed all components and manufacturing protocols and has determined that Lot No. 7 of Contract SP0100-04-D-4031 was manufactured as specified by MIL-A-83406B. Additionally, Derm/Buro will (1) reinspect 200 CSU-13B/P Size M/L of Lot 7 and (2) perform visual, dimensional and two minute inflation tests.
>
> Derm/Buro requests authorization to resubmit Lot No. 7 of Contract SP0100-04-D-4031 on 1/11/07 or 1/18/07 dependent upon which date the reinspection and tests will have been completed.

290. On January 10, 2007, Contracting Officer Dan Price wrote to Derm/Buro regarding Lot 7, advising that Derm/Buro's CAR response was being reviewed by the Government, and that Derm/Buro should not take any further action until advised by the Government.

291. By letter dated January 11, 2007, Derm/Buro acknowledged the Contracting Officer's January 10, 2007 letter and advised that it "will not perform any action until authorized in writing by DSCP."

292. Derm/Buro wrote to the Contracting Officer again on January 26, 2007, requesting authorization to present Lot 7 for re-testing on either January 31, 2007, February 7, 2007, or February 8, 2007. As stated therein, "[t]he current revised delivery schedule…demonstrates delays that are approximately 40 months past the original contract schedule." Derm/Buro advised that the Government's "continuing delay in authorizing a retest of Lot No. 7 that was manufactured with Government modified Nomex fabric (MIL-C-83429B) and verification tested and approved by the Government will continue to contribute to the delay of this critically needed Life Support Equipment by our warfighters."

293. On January 30, 2007, Contracting Officer Dan Price wrote to Derm/Buro advising that its January 26, 2007 Corrective Action Report had been determined to be "unsatisfactory because no suggestions for improvement have been offered or a reasonable cause for the failure of Lot #7 provided." Price further advised that Derm/Buro is "required to screen for and correct any defects and provide recommendations to keep defects from reoccurring."

294. On February 1, 2007, Derm/Buro responded to the Contracting Officer's January 30, 2007 letter, advising that it "did not discover any deficiencies in components, manufacturing, or quality control procedures" with respect to Lot 7. Furthermore, Derm/Buro advised that

"having successfully shipped six previous lots" on the Contract without any Destructive Endurance failures, Derm/Buro "cannot be held responsible for this anomaly."

295. On February 21, 2007, Contracting Officer Dan Price advised Derm/Buro that its CAR dated February 1, 2007 for the fabric rupture experienced during destructive endurance testing on Lot 7 "has been determined to be unsatisfactory." According to Price, the Government conducted tests on Lot 6 and determined that the "bladder material does not conform with the specification outlined in MIL-C-83489 [i.e. weight of bladder material] and that the bladder material seams are not in conformance with MIL-A-83406B." As such, Price asked Derm/Buro to verify in writing by March 2, 2007 that the bladder material for Lot 7 complies with the specifications, and to demonstrate before a QAR that the bladders were cut in conformance with the specifications.

296. On February 23, 2007, Derm/Buro asked Contracting Officer Dan Price for additional information regarding the allegations regarding the bladders on Lot 6 in order to be able to respond to Price's February 21, 2007 letter.

297. By letter dated February 25, 2007, Lamcotec (Derm/Buro's supplier of bladder material) wrote to Derm/Buro regarding the required weight of the bladder material for the anti-G suit under MIL-C-83489. As indicated therein, Lamcotec has been providing bladder material under MIL-C-83489 for approximately twenty (20) years for at least a dozen customers worldwide.

298. On March 1, 2007, Contracting Officer Dan Price sent a "show cause" letter to Derm/Buro asking it to present within ten (10) days any facts bearing on its failure to make the February 28, 2007 delivery under Delivery Order 0001 on Contract 4031.

299. Derm/Buro responded to the Government's "Show Cause" letter on March 8, 2007.

300. On March 27, 2007, in response to Derm/Buro's March 8, 2007 letter, Contracting Officer Dan Price asked Derm/Buro to, *inter alia*, submit a corrective action report for Lot 7 (even though the alleged bladder defects were discovered on Lot 6).

301. By letter dated April 6, 2007, Derm/Buro sent a detailed "Corrective Action Report for Lot #7" to Contracting Officer Dan Price. As stated therein, Derm/Buro has "produced multiple CSU-13B/P Anti-G suit contracts without having a Lot rejection of PQDR for 'Bladders' in over (15) years and with over 60,000 units accepted by the Government."

302. On May 9, 2007, Contracting Officer Dan Price wrote to Derm/Buro and advised that "the Government is considering terminating the above-numbered contract (Contract 4031) under the provisions for default" and requested Derm/Buro to "present facts bearing on the matter."

303. Derm/Buro responded to the Government's May 9, 2007 letter, wherein it provided a detailed explanation and requested that it be permitted to re-submit Lots 7, 8, and 9.

304. On May 17, 2007, Contracting Officer Dan Price advised Derm/Buro that its corrective action report for Lot 7 was unacceptable.

305. On or about May 22, 2007, Derm/Buro sent a letter to Contracting Officer Dan Price, wherein it provided a detailed explanation as to why it bladders were acceptable and how the Government had accepted the same bladders on previous lots.

306. On May 29, 2007, Contracting Officer Dan Price sent a "Show Cause" letter to Derm/Buro regarding Lot 7, wherein he advised that the Government was considering

terminating Lot 7 for default. In the letter, Mr. Price asked for a response from Derm/Buro within ten days.

307. On May 31, 2007, Contracting Officer Dan Price issued Modification 00001/10 terminating for default Derm/Buro's production Lots 8 and 9. The termination of these Delivery Orders was appealed to the ASBCA in 2007, and was subsequently stayed pending resolution of the claim appeals heard by the ASBCA in April 2007.

308. By letter dated June 15, 2007, Derm/Buro responded to the Government's Show Cause letter regarding Lot 7, wherein it explained, among other things, why its bladders were acceptable and had been previously accepted by the Government.

309. On July 2, 2007, Contracting Officer Dan Price sent a Show Cause letter to Derm/Buro regarding Delivery Order 0001, Modification 0001/08.

310. Derm/Buro responded to the Government's July 2, 2007 Show Cause letter in writing in a timely manner.

311. On July 31, 2007, the Government issued unilateral Modification 0001/11 which terminated for default Delivery Order/Schedule 0001/08 (Lot 7).

312. On August 6, 2007, the Government issued unilateral Modification 0002/04 which terminated for default Delivery Order/Schedule 0001/08 for Contract 4031/0001 and 0002/03 for Contract 4031/0002.

Changes to Government Specifications Following Derm/Buro's Contracts

313. Following award and performance of Derm/Buro's Contracts 4027 and 4031, the Government made the following revisions to the Specifications for the Anti-G Garment (MIL-A-83406B) and incorporated the same into MIL-DTL-83406C:

- Fabric weight change: 4.3 – 5.0 ounces per square yard to 4.8 – 5.0 ounces per square yard, and then 4.8 – 5.0 ounces per square yard to 4.6 – 5.0 ounces per square yard;
- Change in spectral reflectance values of the Sage Green 1590 fabric (MIL-C-83429B);
- Dimensional Stability requirements relaxed; and
- Inanimate Model – Added: "The inanimate model should conform to figurine in Table 8. Being an inanimate model shall have smooth surfaces that are free of nicks, burrs, or foreign material. The manufacturer shall dress the model in a serviceable overall that's comparable there that fit the suit for testing."

**COUNT I:**
**WRONGFUL TERMINATION FOR DEFAULT –**
**DEFECTIVE GOVERNMENT SPECIFICATIONS**

314. Plaintiff incorporates the allegations in paragraphs 1 through 313 as if fully stated herein.

315. When the government provides a contractor with design specifications, such that the contractor is bound by contract to build according to the specifications, the contract carries an implied warranty that the specifications are free from design defects and are suitable for their intended purpose. This warranty is based on the fact that the Government has undertaken the responsibility by supplying the specification.

316. At the time Derm/Buro had been awarded Contract 4027, it had been producing anti-G suits for the Government since 1993. During that period of time, it successfully performed on eight contracts and supplied the Government with approximately 60,000 anti-G suits with no failed lots, no rejected lots, no product quality deficiency reports, and no problems reported from the field regarding its suits. Derm/Buro supplied these anti-G suits to the Government in accordance with the Government's design specifications (MIL-A-83406B).

317. MIL-C-83429B required that Derm/Buro provide the Government with fabric made from Dupont Nomex fibers. Dupont is the Government's sole source supplier of Nomex fiber, the design of which is proprietary to Dupont. Nomex had approximately fourteen uses, one of which is the anti-G suit. That said, only the anti-G suit subjects the Nomex fiber/fabric to destructive endurance testing under MIL-C-83406B.

318. On or about March 1, 2002, Dupont made a change in the coloration or pigmentation of the Nomex fiber in response to the Government's request to change the spectral reflectance qualities of the fiber and fabric. The Government never advised Derm/Buro of this change, and never even tested the effects of the change on the physical properties of the Nomex fiber, fabric, or anti-G suit, or how the change would affect the anti-G suit during destructive endurance testing, prior to Dupont making the change.

319. DSCP awarded Contract SPO100-00-D- 4027 to Derm/Buro on June 28, 2000. Contract 4027 was the first Contract awarded by DSCP to Derm/Buro. Prior to that time, Derm/Buro had been providing the anti-G suits directly to the Air Force. Despite the Government's spectral reflectance changes, and Dupont's coloration/pigmentation changes in the Nomex fibers, neither Contract 4027 nor MIL-C-83406B was ever modified to include the specifications for the new Nomex fiber/fabric. Despite this fact, DSCP was requiring Derm/Buro to unknowingly purchase fabric made from the new Dupont Nomex fiber, and to assume all the risks associated with it. As a result of the changes made to the fiber/fabric, Derm/Buro began to experience fabric ruptures during destructive endurance testing that neither it, nor the Government, had ever experienced before. As a result of the fabric ruptures and destructive endurance test failures, Derm/Buro was delayed for approximately forty (40) months and forced to incur substantial amounts of extra costs dealing with the Government's defective

specifications. Derm/Buro was essentially made the Government's "guinea pig" to test out the new Dupont Nomex fabric, and to engage in a massive research and development effort in determining the qualities of the new fiber and fabric.

320. The Dupont coloration change was the only change that occurred and the most likely cause of the fabric ruptures experience by Derm/Buro. The Government's specifications were defective since they did not take into account the new formulation of Dupont Nomex fiber and fabric. This change created a domino effect of subsequent changes and deviations by the Government. First, the Government unilaterally modified Contract 4031 to change the weight range of allowable fabric, in an attempt to require a heavier fabric which it hoped could pass destructive endurance testing. This change led to the inability of the fabric to meet the dimensional stability (i.e. shrinkage) requirements of the specifications, which led to the Government issuing a deviation from the dimensional stability requirements. Meanwhile, Derm/Buro attempted to make an anti-G suit that would pass destructive endurance testing based on a moving target for a specification.

320. As a direct result of the Government's defective specifications, Derm/Buro experienced a fabric rupture during destructive endurance testing on Lot 7, exactly the same as those experienced previously under Contract 4027. Rather than accept responsibility for its defective specifications, the Government attempted to place the blame for the fabric ruptures on the internal bladders used by Derm/Buro's in its anti-G suits. However, the evidence shows that the bladders were not the cause of the fabric rupture on Lot 7, but on the Government's defective specifications and subsequent changes made in an attempt to address these defects.

321. The Government's termination for default of Derm/Buro's Contract 4031 was wrongful and should be converted to a termination for convenience of the Government.

**COUNT II:**
**WRONGFUL TERMINATION FOR DEFAULT – GOVERNMENT CHANGES**

322. Plaintiff incorporates the allegations in paragraphs 1 through 321 as if fully stated herein.

323. As explained herein, DSCP changed Derm/Buro's Contract 4031 by directing the Dupont coloration change to the Nomex fiber to meet its spectral reflectance requirements, and changing the allowable weight range of fabric for the anti-G suits (i.e. Modifications P00004 and P00007). The Dupont coloration change was the result of the Government's changed spectral reflectance requirements. When Derm/Buro experienced fabric ruptures during destructive endurance testing, the Government unilaterally changed the allowable weight range of the fabric from 4.3-5.0 to 4.8-5.0 ounces per square yard (Modification P00004), and later from 4.8-5.0 to 4.6-5.0 ounces per square yard (Modification P00007). This change led problems with the fabric meeting the dimensional stability requirements, which led to the Government's issuance of a deviation from the dimensional stability requirements.

324. As a direct result of the Government's unilateral changes made to address its defective specifications, Derm/Buro experienced fabric ruptures during destructive endurance testing.

325. The Government's termination for default of Derm/Buro's Contract 4031 was wrongful and should be converted to a termination for convenience of the Government.

**COUNT III:**
**WRONGFUL TERMINATION FOR DEFAULT –**
**GOVERNMENT WITHHOLDING OF SUPERIOR KNOWLEDGE**

326. Plaintiff incorporates the allegations in paragraphs 1 through 325 as if fully stated herein.

327. It is a well-established rule that the Government is obligated to impart to the contractor any knowledge it holds exclusively, or that which it knows the contractor cannot obtain, which could directly affect the contractor's performance. Pursuant to its implied duty of good faith and fair dealing, the Government must disclose its superior knowledge to the contractor.

328. The instant case is a textbook example of the Government's withholding of superior knowledge. The Government modified its spectral reflectance requirements, and Dupont implemented a coloration/pigmentation change in order to meet the Government's changed requirements. The Government never advised Derm/Buro of these changes, nor did it amend the specifications in order to reflect the changed Nomex fibers that were being produced by Dupont. To make matters worse, the Government never even performed testing on the changed fibers to determine the effect of the changes on the physical and chemical properties of the fibers and fabric, or whether the changed fibers would be able to withstand the destructive endurance testing required of the anti-G garment. Instead, the Government left it to Derm/Buro to perform all of the research and development work on the new fabric that it had created.

329. When Derm/Buro learned of the Dupont coloration changed in the Nomex fiber, it immediately started its own investigation into the new fabric, while the Government sat by and did nothing. In the process, Derm/Buro was forced to incur substantial additional costs and was severely delayed in performing its contracts.

330. As a result of the Government's failure to disclose superior knowledge to Derm/Buro regarding the Dupont coloration change, Derm/Buro experienced fabric ruptures during destructive endurance testing which led to the termination for default of Contract 4031.

331. The Government's termination for default of Derm/Buro's Contract 4031 was wrongful and should be converted to a termination for convenience of the Government.

**COUNT IV:**
**WRONGFUL TERMINATION FOR DEFAULT –**
**GOVERNMENT BREACH OF**
**IMPLIED DUTY OF GOOD FAITH AND FAIR DEALING**

332. Plaintiff incorporates the allegations in paragraphs 1 through 331 as if fully stated herein.

333. There is an implied provision of every contract that neither party to the contract will do anything to prevent performance thereof by the other party or that will hinder or delay him in its performance. Not only must the government not breach this implied provision, the government must do whatever is necessary to enable the contractor to perform.

334. The Government has been found to have breached its duty to cooperate and not to hinder performance when the contractor encounters problems with the contract specifications. Here, the Government awarded Contract 4031 to Derm/Buro with defective specifications which did not take into account the changes it had made to the spectral reflectance requirements of the Nomex fabric or Dupont's coloration change to the same. Even though DSCP directed Dupont to make these changes, it failed to advise Derm/Buro of the same, and forced Derm/Buro to perform its own investigation and research into the properties of the changed Nomex fibers/fabric.

335. The Government's refusal to acknowledge or accept responsibility for its specifications and the fabric ruptures that that were occurring, in the face of overwhelming evidence from experts in the textile field, has resulted in the destruction of a once-thriving business and supplier of quality products to our warfighters.

336. The Government's termination for default of Derm/Buro's Contract 4031 was wrongful and should be converted to a termination for convenience of the Government.

**COUNT V: WRONGFUL TERMINATION FOR DEFAULT – THE GOVERNMENT'S CHANGED SPECIFICATIONS MADE PERFORMANCE COMMERCIALLY IMPRACTICABLE/IMPOSSIBLE**

337. Plaintiff incorporates the allegations in paragraphs 1 through 336 as if fully stated herein.

338. The Government's defective specifications and changes made performance for Derm/Buro impossible or commercially impracticable. Derm/Buro made every effort to debug and fix the Government's specifications, but its efforts turned out to be futile. The Government refused to acknowledge the effects the Dupont coloration change had on the fabric's ability to withstand destructive endurance testing.

339. Instead of addressing this problem, the Government unilaterally changed the specifications to require a tighter weight range for the fabric. In so doing, the Government created a new fabric that had to be further researched and tested. The change in the weight of the fabric caused it to fail the dimensional stability requirements, which led to further changes to the specifications.

340. The Government's defective specifications and unilateral changes to the specifications resulted in a fabric which was commercially impracticable or impossible to produce.

341. The commercial impracticability/impossibility of performance ultimately resulted in the Government's termination for default of Derm/Buro's Contract 4031.

342. The Government's termination for default of Derm/Buro's Contract 4031 was wrongful and should be converted to a termination for convenience of the Government.

**COUNT VI:**
**WRONGFUL TERMINATION FOR DEFAULT – THE GOVERNMENT IS BARRED BY ESTOPPEL/WAIVER FROM ALLEGING PROBLEMS WITH BLADDERS**

343. Plaintiff incorporates the allegations in paragraphs 1 through 342 as if fully stated herein.

344. The Government never objected to Derm/Buro's bladders until February 21, 2007 following a fabric rupture in Lot 7. Prior to fabric ruptures experienced on Contracts 4025 and 4031, Derm/Buro had manufactured and supplied some 60,000 anti-G suits to the Government since 1993 without a fabric rupture.

345. The suits that had experienced fabric ruptures and failed destructive endurance testing were made with conforming bladders.

346. The Government had been in possession of photographs showing the alleged nonconforming bladders since approximately October of 2003, but never objected to them. In fact, the Government accepted five or six lots after that time without an objection to the bladders. Furthermore, Derm/Buro provided the Government with certificates of conformance on January 6, 2004 showing that its bladder material from Lamcotec was made in conformance with the Government's specifications.

347. The Government is barred by the doctrines of estoppel and waiver from objecting the bladders used by Derm/Buro in its anti-G suits on Contract 4031.

348. The Government's termination for default of Derm/Buro's Contract 4031 was wrongful and should be converted to a termination for convenience of the Government.

**REQUEST FOR RELIEF**

WHEREFORE, based on the foregoing, Plaintiff Derm/Buro, Inc. respectfully requests that the Court sustain the subject appeals, convert the termination for default on Contract 4031

(Modification 0001/11 and Modification 0002/04) to a termination for convenience of the Government, and award all applicable costs and interest to Appellant resulting from the termination, in an exact amount to be determined at trial.

Dated: August 5, 2008

Respectfully submitted,

s/ Kevin M. Cox, Esq.

Kevin M. Cox
*Attorney for Plaintiff*
2110 East Lake Road
Skaneateles, New York 13152
Tel: (315) 251-4107
Fax: (516) 694-8303